EXHIBIT 7:          Hart Deposition

Washington v. Buraker, et al
Depo of: Sheriff Harlan Lee Hart

January 29, 2004

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE WESTERN DISTRICT OF VIRGINIA

3        ,          Charlottesville Division

4    ****************************************************

5    EARL W. WASHINGTON, JR.,

6

7              Plaintiff,

8        -vs-                        CASE NO.
                                     3:02cv00106
9

10   KENNETH H. BURAKER, et al.,

11                                        COPY

12             Defendants.

13   ****************************************************

14        DEPOSITION OF SHERIFF HARLAN LEE HART

15             1:47 p.m. - 5:59 p.m.

16             January 29, 2004

17           Charlottesville, Virginia

18

19

20

21

22

23

24

25        REPORTED BY:  JoRita B. Meyer, RMR, CRR

Washington v. Buraker, et al
Depo of: Sheriff Harlan Lee Hart

January 29, 2004

Page 13

1          A.      Yes, sir.

2          Q.      Do you recall how that came to your

3    attention?

4          A.      I believe it was on Saturday afternoon,

5    I was at home, I received a phone call from the

6    department, and I was supposed to return a phone

7    call to Fauquier.  If memory serves me correct, I

8    did so, I spoke with a Terry -- I mean, Terry

9    Schrum; and that's where the initial investigation

10   began with Mr. Washington.

11         Q.      All right.  Do you recall with any

12   specificity what words Mr. Schrum used?

13         A.      The --

14         MR. GOULD:  Are you asking the witness

15   to quote?

16         MR. HALL:  The question is

17   self-evident, Jack.

18         MR. GOULD:  Object to the form.

19         THE WITNESS:  The wording --

20   approximately, it may not be exact -- was that

21   we have an individual over here who claims he

22   either, I think, raped or stabbed a woman in a

23   Culpeper complex or stabbed -- or raped and

24   murdered a woman in a Culpeper complex.  That

25   was pretty much the extent of the

Page 14

1        conversation.  And if we wanted to come over

2        that afternoon.

3   BY MR. HALL:

4        Q.    All right.  Are you confident that

5   "raped" was part of the statement or words that

6   Mr. Schrum used?

7        A.    I feel pretty confident that was the

8   wording.

9        Q.    Did you decide to go that afternoon or

10   the next day?

11        A.    We went that afternoon.  I went that

12   afternoon.

13        Q.    All right.  And who all went?

14        A.    Special Agent Hugh Elwood with the

15   Virginia State Police.

16        Q.    And where did you first meet

17   Mr. Washington?

18        A.    That afternoon, I didn't even see

19   Mr. Washington.  Went over there, and we decided

20   not to interview Mr. Washington.

21        Q.    Okay.  Was there a reason why?

22        A.    Yes, sir.

23        Q.    And what was that?

24        A.    He had been up most of the night, no

25   rest, and we just didn't think it would be

Washington v. Buraker, et al
Depo of: Sheriff Harlan Lee Hart
January 29, 2004

Page 15

1    appropriate, not having rested.

2         Q.    Did Mr. Schrum or any other member of

3    the Fauquier County Sheriff's Department provide

4    you any notes of their interviews with him?

5         A.    I don't recall that.  Mostly what I

6    recall was verbal.  I don't really know the exact.

7         Q.    Okay.  When you arrived there, did Mr.

8    Schrum -- or I think the other deputy was a Dennis

9    Zeets?

10        A.    Yes, sir, that's correct.

11        Q.    Anybody else from the sheriff's

12   department there involved in the discussions with

13   you when you arrived?

14        A.    They were the only two, I believe.

15        Q.    Okay.  Did either one of them elaborate

16   on what they had learned about Mr. Washington?

17        A.    The only thing I can recall was why he

18   was there, what the offense is, and that would be

19   the most I could -- that's probably the most I can

20   give you right now.  I don't recall anything else

21   other than why he was in their facility and the

22   statement that was made, the reason why we went,

23   had gone over there.

24        Q.    And did you have occasion at that time

25   to meet or talk with Allen Cubbage of the

Washington v. Buraker, et al
Depo of: Sheriff Harlan Lee Hart

January 29, 2004

Page 16

1      Warrenton Police Department?

2           A.     You know, I may have, but I don't

3      recall that.  I'm not saying I didn't, but I don't

4      recall that.

5           Q.     Did you know these folks ahead of time,

6      Mr. Schrum, Mr. Zeets, Mr. Cubbage?

7           A.     No, sir.  I may have heard of Mr.

8      Schrum.  Now, Allen Cubbage, I did have the

9      occasion to cross his path.  I feel certain of

10     that.  I don't know when, where.

11          Q.     Okay.  In the context of this meeting,

12     did Mr. Schrum or Mr. Zeets tell you how they had

13     come to take Mr. Washington into custody?

14          A.     I believe so.  I believe so.

15          Q.     And that they had charged him at

16     that -- by that time with the breaking and

17     entering of the home of Hazel Weeks?

18               MR. GOULD:  I'm going to -- excuse me,

19          Bob, are you done with the question?

20               MR. HALL:  Huh?

21               MR. GOULD:  Are you done?  I didn't

22          want to interrupt, but I have an objection.

23               MR. HALL:  No, that's all right.

24               MR. GOULD:  I'm just going to object to

25          foundation and a belated objection to the

434.975.5400 (Fax)
production@cavalier-reporting.com          Cavalier Reporting, Inc          434.293.3300(Direct)
www.cavalier-reporting.com

Washington v. Buraker, et al
Depo of: Sheriff Harlan Lee Hart

January 29, 2004

Page 17

1       earlier question as well.

2                  THE WITNESS:  Yes, sir, Ms. Weeks' name

3           did come up.

4   BY MR. HALL:

5           Q.     Did they indicate to you that he had

6       also confessed to the rape and robbery of a Lynn

7       Rawlings in Warrenton?

8           A.     I don't recall that one at that time.

9           Q.     Or the attempted rape of a Cynthia

10      Hecker?

11          A.     I don't -- the only one I was familiar

12      with was Ms. Weeks.

13          Q.     Ms. Weeks?

14          A.     Yes, sir.

15          Q.     Okay.

16          A.     If memory serves me correctly.

17          Q.     Did Mr. Schrum or Mr. Zeets indicate to

18      you how they had happened to turn Mr. Washington's

19      attention to the murder of Rebecca Williams?

20                 MR. GOULD:  I'm going to object to the

21          form of that question.

22                 THE WITNESS:  I believe Mr. Washington,

23          after they had interviewed --

24                 MR. BENNETT:  Just a second.  Let's

25          take a break.

Page 19

1    night's sleep.

2              And we got back, we notified, I

3    believe, at that time Special Agent Rodney Grimes,

4    who was in charge of the BCI with the state

5    police, and also may have had a discussion

6    probably with Special Agent Reese Wilmore; and we

7    scheduled to go back the next day.

8         Q.    About what time did you get back the

9    next day?

10        A.    Ballpark, around 9 o'clock the next

11   morning.

12        Q.    Who all attended with you?

13        A.    It was Special Agent Reese Wilmore and

14   myself.

15        Q.    All right.  And you met Mr. Washington

16   for the first time?

17        A.    Yes, sir, that's correct.

18        Q.    When you first met him, were Deputies

19   Schrum and Zeets in attendance, or were you merely

20   introduced to Mr. Washington?

21        A.    I believe we were just introduced.

22   They didn't sit in on that interview.

23        Q.    And the interview was conducted where,

24   sir?  In his cell, or in an interview room?

25        A.    It was in an interview room in the

434.975.5400 (Fax)
production@cavalier-reporting.com          Cavalier Reporting, Inc          434.293.3300(Direct)
www.cavalier-reporting.com

1     Fauquier County Sheriff's Office.

2          Q.     Prior to this meeting, had you ever

3     heard Mr. Washington's name involved in any law

4     enforcement issues?

5          A.     Not since the night before, you know,

6     no, sir.

7          Q.     And approximately how long did you talk

8     with him on that occasion?

9          A.     That day?

10         Q.     That day, yes.

11         A.     Talk, or spend time with him?

12         Q.     Either.

13         A.     We spent probably from 10 o'clock until

14    that afternoon, we came back to Culpeper around 2,

15    2:30, and he parted, I don't know the exact time,

16    I would say 6 or 7.  That would be an estimate.  I

17    could be wrong on that.

18         Q.     About what time did you transport him

19    back to Culpeper?

20         A.     I believe it was --

21                MR. GOULD:  Objection to form and, I'm

22         sorry, foundation -- sorry, strike that.

23                THE WITNESS:  Yes, sir.

24    BY MR. HALL:

25         Q.     Go ahead.

Washington v. Buraker, et al
Depo of: Sheriff Harlan Lee Hart

January 29, 2004

Page 24

1    background?

2        A.    Yes, sir.

3        Q.    And what he was doing for a living and

4    that sort of thing?

5        A.    Yes, sir.

6        Q.    Okay.  And did you write down anywhere

7    how much schooling he had had or if he had quit

8    school, why, and that sort of thing?

9        A.    No.

10            MR. BENNETT:  I'm going to object to

11        the form of that question.  He's said there

12        were no notes taken during the informal

13        interview.

14            THE WITNESS:  There were no notes taken

15        during the informal interview.  But the

16        education did come out in the statement that

17        was given by Mr. Washington.

18    BY MR. HALL:

19        Q.    Did he seem slow to you?

20            MR. GOULD:  Objection to form.

21            THE WITNESS:  I would say he did appear

22        to be a bit uneducated, not being derogatory.

23            MR. HALL:  Jack, I won't take your form

24        objection to everything, but this is a party

25        witness and I can lead, so if you want a form

Page 85

1        Q.      This was kind of a high profile case in

2    Culpeper?

3        A.      Yes, this was a high profile case.  Any

4    homicide, though, would be a high profile case.

5        Q.      Did this seem to be particularly brutal

6    in terms of the number of stab wounds, a rape, and

7    a mother of young children?  Was it high profile

8    that way?

9        A.      It was a case that drew a lot of

10   interest.

11       Q.      Okay.  Now, had you had anyone suggest

12   to you, prior to Earl's arrest over in Fauquier

13   County, that you ought to look into Earl

14   Washington or consider him a suspect?

15       A.      I don't recall Earl's name coming up.

16       Q.      Had he been on the Culpeper Police

17   Department radar screen, if you will, for any

18   purpose up to that time?  Was he known to the

19   department?

20       A.      I didn't know him.

21       Q.      Did anyone on the team know him or know

22   of him?

23       A.      If they did, his name didn't come up.

24       Q.      Okay.  Now, Mr. Washington, when he was

25   interrogated, said he was driven to the scene by a

Washington v. Buraker, et al
Depo of: Sheriff Harlan Lee Hart

January 29, 2004

Page 131

```
 1    concern, but as time went on, with other variables

 2    playing a part in this case, his defense, Billy,

 3    and some other things pertaining to this case, the

 4    blood work that later came about, all those things

 5    played a part -- well, almost:  Is it or isn't it?

 6        Q.    Let's try to limit it right now to May

 7    22nd of 1983, and as this is going down, if you

 8    will, and Mr. Washington describes the victim as

 9    black, but then changes it to white, then he says

10    there wasn't anybody else in the apartment, and

11    you had knowledge that the two children were

12    there?

13        A.    Right.

14        Q.    Did that raise any flags?

15            MR. GOULD:  I'm going to just object to

16        foundation.

17            THE WITNESS:  In thinking back, there

18        were some inconsistencies, but there were some

19        things that we felt had a lot of merit to it

20        in the interview.

21    BY MR. HALL:

22        Q.    When he said he stabbed her one, two,

23    three, times, and she had 30-some stab wounds, did

24    that raise any flags?

25        A.    In law enforcement in 30 years, heat of
```

Washington v. Buraker, et al
Depo of: Sheriff Harlan Lee Hart

January 29, 2004

Page 132

1       passion, sometimes you're not thinking completely.

2           Q.    In fact, wasn't it one of the working

3       hypotheses in this investigation that Rebecca

4       Williams was the victim of a crime of passion?

5           A.    I think that was mentioned.

6           Q.    Did anyone -- I guess you went off to

7       the FBI school in Quantico?

8           A.    Yes, sir.

9           Q.    Up to this point, had you taken any

10      courses in or were you familiar with an officer

11      who would do psychological profiles of killers,

12      based on the evidence?

13          A.    Yes, somewhere this case went through

14      that.

15          Q.    And do you know who did the

16      psychological profiling?

17          A.    I don't know off the top of my head.

18          Q.    The 38 stab wounds, that had -- that

19      was information for the psychological assessment

20      of this case, wasn't it?

21          A.    I can't say from a profile -- I'm not a

22      profiler.  You know, it could be, could have been.

23          Q.    But do you believe that this killer was

24      profiled by someone?

25          A.    Yes, I believe this case was profiled

Washington v. Buraker, et al
Depo of: Sheriff Harlan Lee Hart

January 29, 2004

Page 133

```
 1    at some time, and I don't recall when.
 2         Q.    Do you think it was contemporaneous
 3    with the investigation in '82, or something done
 4    after Washington's arrest?
 5         A.    I believe it was done -- I might be
 6    getting this confused with another homicide I
 7    worked prior or was involved in prior, but that --
 8    profiling does sound like it may have been
 9    involved in this case.
10         Q.    Let me turn your attention to the
11    statements that Mr. Washington gave that you
12    viewed as confirmatory of his being the actual
13    perpetrator.  What was it that he said that
14    reassured you that, okay, the race of the victim
15    and the number of stab wounds and the absence of
16    people in the apartment and the kicking open the
17    door, those don't fit, but these do; what were the
18    ones that fit?
19         A.    I believe he mentioned that the radio
20    was on.  We felt he was convincing in some of
21    those questions, the majority of the questions.
22    The shirt.  And I have to look at the statement.
23    I could probably point out some others.
24         Q.    How about halter top?
25              MR. GOULD:  How about what?
```

Page 134

1    BY MR. HALL:

2         Q.    Halter top, did Mr. Washington say that

3    he took off her halter top?

4         A.    He may have.  I would have to look at

5    the statement.

6               Also the back bedroom, I think that was

7    mentioned in the statement as well.

8         Q.    But you don't remember the halter top

9    being a particular statement of his that reassured

10   you that these other discrepancies were

11   unimportant?

12        A.    Halter top was in the statement or in

13   the interview in some fashion.  I don't recall the

14   exact right now.  I'd have to look at some

15   document.

16        Q.    Have you reviewed a memorandum prepared

17   by Deputy Attorney General John McKlese (ph.) or

18   Assistant Attorney General John McKlese about a

19   conversation with Reese Wilmore?

20        A.    I saw a copy of that.  I don't have a

21   copy of that.

22        Q.    Would you tell me, in as much detail as

23   you can remember, how this shirt was presented to

24   Mr. Washington, who said what, and how

25   Mr. Washington responded?

Washington v. Buraker, et al
Depo of: Sheriff Harlan Lee Hart

January 29, 2004

Page 135

1    A.    If I recall correctly, of course, the

2    shirt was a very important piece of evidence, and

3    of course we wanted him to tell us about the

4    crime, not us tell him.  The shirt was asked -- I

5    think -- well, he was asked to the effect, "Did

6    you take or leave anything from the scene?"  And

7    we may have went as far as to say a piece of

8    clothing.  And that's when he said, "A shirt."

9    But he said, "A shirt."

10         At that point, Investigator Reese

11   Wilmore asked me to go out to the car, because we

12   had the shirt in the car at that time, in a bag,

13   and I brought the shirt back in, and at that

14   point, the shirt was shown to him.  And he was

15   asked, "Is this your shirt?"  That's where the

16   shirt came from.

17        Q.    And he responded yes?

18        A.    Yes.

19        Q.    And he was asked how he knew that was

20   his shirt?

21        A.    Because the patch.  And why the patch?

22   Because it was torn off.

23        Q.    So I take it the front of the shirt was

24   shown to Mr. Washington, rather than the back of

25   the shirt?

434.975.5400 (Fax)
production@cavalier-reporting.com         Cavalier Reporting, Inc         434.293.3300(Direct)
www.cavalier-reporting.com

Page 136

1        A.      After he said he had left the shirt,

2    yes, sir.

3        Q.      He said he had left the shirt, you went

4    to the car, brought in the shirt, and

5    Mr. Washington was asked, "Is this the shirt?"

6    And he said yes?

7        A.      Yes, sir.

8        Q.      Did you ever understand why Mr. Wilmore

9    was concerned about the way the shirt was

10   presented to Mr. Washington?

11       A.      Is this the memo you're referring to?

12       Q.      Yes, sir, or a conversation that you

13   had with him?

14       A.      A conversation?

15           MR. GOULD:  Excuse me, I'm going to --

16       I'm sorry, it's getting late.

17           MR. HALL:  You'd think this man worked

18       for the Fauquier County Sheriff's Department

19       with all these objections.

20           MR. GOULD:  I got to keep myself amused

21       here, Bob, so I can keep myself from falling

22       asleep, so I'm going to make an objection.

23       I'm just not clear what you're asking the

24       witness.  I want to make sure he's going to

25       answer you from anything he was told by

Washington v. Buraker, et al
Depo of: Sheriff Harlan Lee Hart

January 29, 2004

Page 137

1          Wilmore, not something he's discerning from

2          something he read, if you understand my

3          objection.

4                  MR. HALL:  He can say, depending on

5          what his answer was, from what source, was it

6          something he said or something he read.

7     BY MR. HALL:

8          Q.    I can have her read it back, but let me

9     ask it again.  Did you understand what

10    Mr. Wilmore's concern was with the way

11    Mr. Washington had identified the shirt?

12         A.    You're talking about the memo that he

13    wrote or he called down or --

14         Q.    Yeah, either from your review of his

15    memo or your conversations with him.

16         A.    The only conversation pertaining to the

17    shirt was -- we did not have any discussion that I

18    can recall where the shirt was an issue.  This is

19    a surprise to me, when I saw this memo.

20         Q.    All right.

21         A.    And even to go a little further,

22    Mr. Washington said he left the shirt in a dresser

23    drawer.  So that -- these are some of the things

24    that I don't know how he could have known.

25         Q.    At the time Mr. Washington was

434.975.5400 (Fax)
production@cavalier-reporting.com          Cavalier Reporting, Inc          434.293.3300(Direct)
www.cavalier-reporting.com

1      A.     I didn't conclude that, no, sir.  It's

2  a possibility.

3      Q.     In terms of your training as of May

4  22nd of 1983 in the conduct of interrogations, had

5  you had any particularized training in how to

6  identify people with mental disabilities or

7  disorders?

8      A.     No, sir.

9      Q.     Okay.  Had you ever interrogated a

10  child?

11     A.     I feel certain I had at sometime.

12     Q.     Had you had any special training for

13  how to handle a child when you ask them questions?

14     A.     At that time, I don't recall what

15  training I had pertaining to interviewing a child

16  or a retarded -- or a so-called retarded

17  individual.

18     Q.     And you observed that Mr. Washington

19  had some limitations, some cognitive impairments?

20          MR. GOULD:  Objection; foundation.

21          THE WITNESS:  As I have indicated,

22     without being derogatory of Mr. Washington, he

23     appeared to be a bit uneducated.

24  BY MR. HALL:

25     Q.     Was it just uneducated, or was he also

434.975.5400 (Fax)
production@cavalier-reporting.com        Cavalier Reporting, Inc        434.293.3300(Direct)
www.cavalier-reporting.com

Page 142

```
1     slow?

2               MR. GOULD:  Asked and answered.

3               MR. BROADDUS:  Objection to form, also.

4               THE WITNESS:  He was slow in answering

5        some questions, yes, sir.

6     BY MR. HALL:

7        Q.     Regarding your informal session that

8     took about an hour, did it take about an hour

9     because he was slow in responding to questions?

10       A.     I don't -- to respond to your question,

11    I don't -- I can't say it was because he was slow

12    it took that long.  I think we were trying to be

13    as detailed as possible, to find out as much about

14    Mr. Washington as we could.

15       Q.     In terms of everything -- let me put it

16    this way.  Did you have any -- when you started

17    questioning him and determined that he was

18    undereducated and was slow to answer some

19    questions, did you have any indications to inquire

20    further about his limitations?

21       A.     You mean after the confession was

22    obtained?

23       Q.     No, during the interrogation itself.

24       A.     There may have been some questions that

25    were asked pertaining to his educational
```

Page 143

1       background.  I don't recall, you know, whether or

2       not we asked if he was -- what type of school he's

3       attending, whether it may be a school for -- the

4       term is --

5               MR. BENNETT:  Well, if you don't

6           recall, why are you talking about it?

7               THE WITNESS:  Yeah, I don't recall.

8               MR. BENNETT:  We've been going right

9           long.  Should we take a break?  How much

10          longer?

11              MR. HALL:  I'm getting down there

12          because it's sunset now.  I turn into a

13          pumpkin, so remind me when we're alone and I

14          can tell you a pumpkin joke.

15              MR. GOULD:  I don't think you responded

16          to Mr. Bennett's question.

17              MR. BROADDUS:  Let's take a break, at

18          least long enough for me to make sure that the

19          cars downstairs aren't getting locked in.

20              MR. HALL:  Oh, yes, please.

21

22              (Recess)

23

24              MR. HALL:  All right.  Let's go back on

25          the record, if that's all right with you.

434.975.5400 (Fax)
production@cavalier-reporting.com          Cavalier Reporting, Inc          434.293.3300(Direct)
www.cavalier-reporting.com