EXHIBIT 11:    Dabbs Deposition

1

```
1            IN THE UNITED STATES DISTRICT COURT

2           FOR THE WESTERN DISTRICT OF VIRGINIA

3                  CHARLOTTESVILLE DIVISION

4

5        ------------------------------
         EARL WASHINGTON, JR.,          )
6                     Plaintiff,        )
                                        )Case No. 3:02CV00106
7        vs.                            )
                                        )
8        KENNETH H. BURAKER, et als.,   )
                      Defendants.       )
9        ------------------------------

10                TO BE FILED UNDER SEAL

11        AND SUBJECT TO THE PROTECTIVE ORDER

12       CERTIFIED COPY          November 10, 2003

13                               Richmond, Virginia

14

15           The deposition of DEANNE F. DABBS, taken at

16       the instance of the Plaintiff, before Carolyn M.

17       O'Connor, RMR, CRR, a Notary Public for the

18       Commonwealth of Virginia at Large, beginning at 9:28

19       a.m., at the Division of Forensic Science, 700 North

20       Fifth Street, Richmond, Virginia; said deposition

21       taken pursuant to the Federal Rules of Civil

22       Procedure.

23                      COOK & WILEY, INC.
                 Registered Professional Reporters
24                   Post Office Box 14582
                     Richmond, Virginia 23221
25                      (804) 359-1984
```

2

```
1    APPEARANCES:

2

3    Peter J. Neufeld, Esquire
     COCHRAN, NEUFELD & SCHECK, LLP
     99 Hudson Street
4    New York, New York  10013
     and
5    Robert T. Hall, Esquire
     HALL, SICKELS, ROSTANT, FREI & KATTENBURG
6    12120 Sunset Hills Road, Suite 150
     Reston, Virginia  20190
7    Counsel for the Plaintiff Earl Washington

8

9    Richard K. Bennett, Esquire
     Lynne Jones Blain, Esquire
     HARMAN, CLAYTOR, CORRIGAN & WELLMAN
10   4951 Lake Brook Drive
     Glen Allen, Virginia  23060
11   Counsel for the Town of Culpeper and
     Kenneth H. Buraker
12

13   Stephanie L. Karfias, Esquire
     McGUIREWOODS
14   One James Center
     901 East Cary Street
15   Richmond, Virginia  23219
     Counsel for Reese Wilmore and Denny Slane
16

17   James O. Towey, Esquire
     Martin L. Kent, Esquire
18   ASSISTANT ATTORNEYS GENERAL
     Organized Crime Unit
19   Special Prosecutions Section
     Office of the Attorney General
20   900 East Main Street
     Richmond, Virginia  23219
21   Counsel for the Department of State Police

22

23   Jack L. Gould, Esquire
     ATTORNEY AT LAW
     10615 Judicial Drive, Suite 102
24   Fairfax, Virginia  22030-5165
     Counsel for Terry Schrum, Estates of Denny Zeets
25   and Luther Cox
```

COOK & WILEY, INC.

3

1  APPEARANCES:  (Continuing)

2

3  Brian K. Brake, Esquire
   KEELER OBENSHAIN
   111 East Market Street
4  Harrisonburg, Virginia  22803
   Counsel for Gary L. Close

5

6  A. Cameron O'Brion, Esquire
   ASSISTANT ATTORNEY GENERAL
7  Office of the Attorney General
   900 East Main Street
8  Richmond, Virginia  23219
   and
9  Katya K. Newton, Esquire
   DIVISION OF FORENSIC SCIENCE
10 Commonwealth of Virginia
   Department of Criminal Justice Services
11 700 North Fifth Street
   Richmond, Virginia  23219
12 Counsel for the Division of Forensic Science

13

14              I N D E X

15                                      PAGE

16 **DEANNE F. DABBS**

17    By Mr. Neufeld..............................5

18    By Mr. Bennett............................132

19    By Mr. Gould..............................135

20    By Ms. Karfias............................136

21    By Mr. Neufeld............................137

22

23

24

25

4

1

2                              E X H I B I T S

3      NUMBER                                              PAGE

4          1      Eighteen Pages of Handwritten Notes.18

5          2      10-22-82Virginia State Police Report
                      Prepared by Office Wilmore........27
6
7          3      Handwritten Document Entitled
                      Urine Tests......................71

8          4      8-12-83 Certificate of Analysis.....101

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1           MR. NEUFELD:  Folks, I think we'll use

2      the usual federal stips?

3           MR. GOULD:  I don't know what you mean by

4      the usual federal stips.

5           MR. NEUFELD:  Well, about objections.

6      Obviously objections as to form should be made

7      and all other objections are preserved.

8           MR. BENNETT:  Yeah.

9           MR. GOULD:  Relevancy objections, of

10     course, would be irrelevant.

11          MR. NEUFELD:  Okay.

12

13     **DEANNE F. DABBS**, called by the Plaintiff,

14   first being duly sworn, testified as follows:

15

16     EXAMINATION BY MR. NEUFELD:

17          Q    Ms. Dabbs, my name is Peter Neufeld, and

18   I represent, along with other counsel, Earl

19   Washington in a civil lawsuit that he has, and we're

20   going to be going over a lot of documents.  If it

21   takes time for you to find the right document,

22   please, whatever time it takes, because that's what

23   this is really about today.

24          Could you first, Ms. Dabbs, give us a

25   little summary of your background, just your

6

1    education, training, professional employment.

2         A    I hold a master's degree in forensic

3    science from George Washington University in

4    Washington, D.C.; I hold a bachelor of science

5    degree in medical technology from the Medical

6    College of Virginia Health Sciences Division of

7    Virginia Commonwealth University and from Mary

8    Washington College in Fredericksburg, Virginia.  I

9    spent probably a year in a training program of

10   concentrated study in the techniques used in

11   forensic science for the examination of blood, body

12   secretions, hairs and natural fibers.  During that

13   time I worked with examiners who were qualified in

14   those areas and worked on hundreds of cases and

15   items of evidence.  I was qualified as a forensic

16   scientist in the area of forensic serology, hairs

17   and natural fibers in 1978, and I worked on cases

18   here.  Then I transferred to the Northern Laboratory

19   in Fairfax County, and I was there from 1978 until

20   1988, at which time I was promoted and came back to

21   Richmond and have been with the Division up until

22   today.

23        Q    And what's your current position here

24   with the Division?

25        A    I'm the program manager for the forensic

7

1    biology section, which is statewide responsibility

2    for the operation of the section.

3         Q    Thank you.  Now, you did the original

4    work on the Earl Washington case or, I should say,

5    on the Rebecca Williams homicide back in 1982?

6         A    The original forensic biology, yes.

7         Q    And you did work in 1983 when

8    Mr. Washington was arrested in connection with this

9    case as well; is that correct?

10         A    I did it in 1982 and 1983, yes, that is

11    correct.

12         Q    But you didn't testify in the prosecution

13    of Mr. Washington; isn't that right?

14         A    That is correct.

15         Q    But you did testify for the first time in

16    a federal *habeas corpus* proceeding in the early

17    1990's?

18         A    Yes.

19         Q    Do you recall that?

20         A    Yes.

21         Q    Was that the first time you ever

22    testified in connection with this matter?

23         A    Yes, it was.

24         Q    Had you had any reason to review the

25    files in this case between 1983 or 1984 and the

COOK & WILEY, INC.

115

1    on Stain 2 of the blue blanket other than what you

2    did in the summer of 1982?

3         A    No, I did not.

4

5              (Discussion off the record.)

6

7         Q    Other than the fact that Earl Washington

8    was arrested in May of 1982 and -- I'm sorry,

9    withdrawn.

10             What was the date you said you did the

11   transferrin testing on Earl Washington's sample?

12        A    August 4 of 1983.

13        Q    What happened after August 4 of 1983 that

14   led you to amend the Certificate of Analysis with

15   respect to the transferrin type of Stain 2 on

16   Item 24?

17        A    An article came out -- I believe it was

18   in the *Journal of Forensic Science* -- which

19   indicated that a transferrin Type C upon degradation

20   could appear to be a transferrin Type CD.  In light

21   of that article, I went back on all cases that I had

22   issued certificates on, which were this one and

23   perhaps one other case that I recall, and I amended

24   the report to reflect the transferrin type as being

25   inconclusive in light of the fact that a transferrin

116

1    C as it degrades can give the appearance of a CD.

2         Q    And did this article appear in the

3    *Journal of Forensic Science* --

4         A    That would be my best recollection, that

5    that's where it was.

6         Q    In the *Journal of Forensic Science* in

7    August of 1983?

8         A    I don't recall the date.

9         Q    Well, when did you read the article?

10        A    I don't recall that either.

11        Q    Well, was it during --

12        A    I don't have any recollection of that at

13   all.

14        Q    Was it during the summer of 1983?

15        A    I don't have any recollection of when I

16   read the article.  Once I read the article, I

17   corrected -- amended this report, and I believe it

18   would -- it would be my best recollection that there

19   was at least one other Certificate of Analysis

20   associated with a different case where I had

21   reported a transferrin Type CD result.

22        Q    But as you sit here today, to the best of

23   your recollection, you just happened to be reading

24   the *Journal of Forensic Science,* and that was one of

25   the articles in it, and as a result of that, you

117

1   took this remedial action?  Is that basically what

2   you're saying?

3       A    Yes, that is correct.

4       Q    It wasn't because Earl Washington didn't

5   have the CD that someone suggested to you that you

6   look for certain articles or anything like that?

7       A    Absolutely not, absolutely not.

8       Q    Now, fast forward ten years to 1992.  You

9   were the person who was asked to do the retesting,

10  if you would, on certain items of evidence in this

11  case; is that correct?

12      A    No, I don't believe that's correct.  That

13  wouldn't be my recollection.

14      Q    Well, on May 14 of 1993, did you write a

15  memorandum evaluating Item 58 and Item 45 for

16  possible DNA testing?

17      A    Did I write a memorandum?  I wrote a memo

18  to the file with regard to a telephone conversation

19  that I had on May 14 of 1993 with John McLees, who

20  was an Assistant Attorney General, answering

21  questions, inquiries that he had with regard to the

22  case.  Is that what you are referring to?

23      Q    Yes.  Is this your handwriting, or is

24  this Jeff's?

25      A    No, that's mine.  Here are my initials

132

1        Q     What about the cutoffs?

2        A     I'm sorry, which item number are you

3   referring to?  Is it Item 22, Levi cutoffs?

4        Q     Yes.

5        A     They were also returned to Investigator

6   Buraker on July 14 of 1982.

7        Q     July 14 of '82?

8        A     Yes, the same date as the blue underpants

9   and jeans.

10       Q     Thank you, Ms. Dabbs, that's all.  These

11   folks may have questions.  I have no idea.

12             MR. BENNETT:  I've got a couple.

13

14       EXAMINATION BY MR. BENNETT:

15       Q     Ms. Dabbs, calling your attention to item

16   No. 24, the blue baby blanket, that's the one with

17   four blood stains on it, I believe.

18       A     Yes, it did have four blood stains.

19       Q     And I believe Stain 2 was the one that

20   you testified at first you got a Tf result of CD,

21   and then you later amended your report because of

22   some research that you saw at some point in time.

23   Is that the item?

24       A     That is the item, yes.

25       Q     Looking at those four stains generally,

133

1    are those four stains, putting aside the Tf issue,

2    all consistent with the victim's blood?

3         A    Yes, they are, with the exception of the

4    transferrin CD as originally reported.

5         Q    And these were four discrete blood stains

6    on a baby blanket?

7         A    Yes, that's correct.

8         Q    Was there anything about them that would

9    make you think that one of those four stains was

10   somebody else's blood other than the victim just by

11   the appearance of them?

12        A    No, I was --

13             MR. NEUFELD:  Objection.

14             Go ahead.

15        A    I was looking for isolated stained areas,

16   and my notes described those as four isolated areas

17   found.  So each one of those were not necessarily a

18   discrete stain, but a stained area, an isolated

19   stained area.

20        Q    On stain No. 2, other than the Tf result,

21   the rest of those results on all those things that

22   you did were all consistent with the victim,

23   Ms. Williams?

24        A    Yes, that's correct.

25        Q    And the research that you saw, can you

134

1   explain a little further about why that led you to

2   change your conclusion on that one test?

3        A    Well, it's been quite some time since I

4   read the article, but as I recall, the article

5   indicated that as the transferrin Type C degrades,

6   before it totally disappears and is no longer

7   detectable, the C changes into the appearance of a

8   CD; and therefore, as I -- my best recollection

9   would be that the stains on this baby blanket were

10  fairly heavy stains; therefore, there was concern in

11  my mind that one reasonably could expect that

12  degradation had occurred in those stains; and I felt

13  like the most responsible thing to do as a scientist

14  was to issue an amended report, correct my original

15  result, which I had reported it as a CD, to call it

16  an inconclusive based on the information that came

17  out in the scientific literature; and as I stated, I

18  not only did it for this report, I believe I did it

19  for at least one other Certificate of Analysis that

20  was issued in the same timeframe as this Certificate

21  of Analysis.

22       Q    Now, your notes indicate that you had a

23  meeting -- on the front of this 1982 report, the

24  nine-pager, it indicates you had a meeting on

25  August 25 of '83 with the prosecutor and some of the

135

1   police officers.  Do you see that?

2        A    Yes, with John Bennett, the prosecutor;

3   Reese Wilmore, State Police; and Kenny Buraker of

4   Culpeper on August 25 of 1983.

5        Q    Did that meeting prompt you to amend that

6   report to make that one correction?

7        A    Absolutely not.

8        Q    Was that correction made at the

9   suggestion of anyone other than your realizing that

10  that probably was an error?

11       A    Absolutely not.

12       Q    Did it have anything to do with Earl

13  Washington being a suspect or under indictment?

14       A    Absolutely not.  It had to do with

15  scientific principle.

16       Q    And the overall conclusion that you would

17  reach from these four stains on that blanket is that

18  that's all victim blood or consistent with --

19       A    It is certainly consistent with Rebecca

20  Williams, yes.

21       Q    I think that's all I wanted to clear up.

22            MR. GOULD:  Just a quick question.

23

24       EXAMINATION BY MR. GOULD:

25       Q    Did you ever have any meeting about the

COOK & WILEY, INC.