CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

APR 0 6 2004

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

| | |
|---|---|
| EARL WASHINGTON, JR. | Civil Action No. 3:02CV106 |
| | (Hon. Norman K. Moon) |
| Plaintiff, | |
| vs. | |
| KENNETH H. BURAKER, et al., | |
| Defendants. | |

## MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT

Comes now the Plaintiff by his counsel and moves this Honorable Court for Leave to File his Second Amended Complaint, and in support thereof states as follows:

<u>Background</u>

1. In this lawsuit, a mentally retarded man, wrongfully accused and convicted of rape and murder, seeks appropriate relief for having lost almost twenty years of his life to prison, half of that time on death row and half as a convicted murderer. The facts giving rise to the claim are well known to the court and will not be repeated here.

2. What is not yet known to the court is the fact that conclusive evidence, which has been in the possession of the Commonwealth of Virginia for ten years, has now confirmed beyond doubt or cavil that the rape and murder of Rebecca Williams was committed by Kenneth Maurice Tinsley, who, having been previously convicted of two rapes in Illinois, is currently serving a life sentence in the Virginia penitentiary system for the rape of a Virginia citizen. Mr. Tinsley's DNA has just

1

been identified as the sperm component in a mixture of biological fluids found on the vaginal slide collected by the Medical Examiner during the autopsy of the victim in the instant case. (*See* April 1, 2004, report of forensic expert, Dr. Edward T. Blake, attached as Exhibit B to the Proposed Second Amended Complaint.)

3. This identification does not come courtesy of the defendants or the Commonwealth of Virginia. In fact, in 1993 proposed defendant Jeffrey Ban misreported the results of his testing on this evidence and in 2000 his results on the vaginal slide were scientifically incorrect and misrepresented the reality that Mr. Washington was completely innocent. The forensic truth now emerges from testing of evidentiary material subpoenaed by Mr. Washington from the Office of the Chief Medical Examiner of the Commonwealth of Virginia, material which has been subjected to unimpeachable testing of the highest degree of reliability by forensic expert, Dr. Edward T. Blake. By dint of the dogged work of Mr. Washington's counsel and lay advisors, and in the face of the active opposition of the defendants in this case, it has now been conclusively established that the claims of the defendants, the Commonwealth of Virginia, and the Special Prosecutor that Mr. Washington had anything to do with this heinous capital murder are untenable, irresponsible, and false.

4. If granted leave to amend, Mr. Washington will plead facts with specificity which conclusively establish his complete and utter innocence of the rape and murder of Rebecca Williams, and put to rest, once and for all, the relentless campaign waged by the instant defendants, a campaign based on innuendo alone and contradicted by the facts well known to them, to contend publicly and in their pleadings, that Mr. Washington had not been "ruled out" or "excluded" as a suspect in the rape and murder of Rebecca Williams. (*See* Proposed Second Amended Complaint, attached hereto.)

5. Mr. Washington, by the instant motion, seeks to bring before this court Jeffrey D. Ban and Deanne F. Dabbs, those additional defendants who, individually and in conspiracy with others,

manipulated scientific fact and forensic conclusions to make them appear consistent with Mr. Washington's guilt, when in fact the forensic evidence spoke powerfully of his innocence.

## The History of Forensic Testing

6. The newly discovered misreporting of the DNA and other forensic evidence by proposed defendants Jeffrey D. Ban and Deanne F. Dabbs was not isolated, but arose in the context of a twenty-year pattern, practice and policy within the Commonwealth of Virginia Department of Criminal Justice Services Division of Forensic Science to interpret forensic evidence in this case consistently with the prosecution's theory, in intentional or reckless disregard of the scientific facts:

## Evidence Item #25, the Royal Blue Blanket

7. A royal blue blanket was found on the victim's blood soaked bed. On the blanket itself were five blood stains and five seminal stains. In 1982, forensic DNA testing had not been invented. The Commonwealth of Virginia's Department of Criminal Justice Services Division of

Forensic Science, like other crime labs, instead relied on conventional ABO blood-group typing.

8. The ABO genetic marker system is complicated by the fact that the ABO blood group substances are found in two forms in human beings. They are found in a form that is associated with cell membranes, and, in most individuals, they are found dissolved in the fluid portion of body fluids and secretions such as semen, saliva, and vaginal fluid. Within the ABO genetic marker system there are four possible types: A, B, AB, and O. Every member of the population falls into one of these four types, and every member of the population has the appropriate A, B, A and B, or O (H) blood group substance on the surface of his or her red blood cells.

9. Eighty percent of the population are "secretors;" that is, they will also have the corresponding blood group substance dissolved in the watery portion of their semen, saliva, or vaginal fluids. Individuals who are nonsecretors (20% of the population) will not have the corresponding blood group substance in the watery portion of their body fluids even though they

have blood group substance on their blood cells. Individuals who are A, B, or AB secretors, in addition to possessing the appropriate A, B, or A and B blood group substances, also posses the H (O) group substance. This is so because the H (O) blood group substance is a precursor substance upon which the A and B blood group substances are built. Since the ABO blood group substances in semen are the water soluble form, ABO typing of semen containing deposits is conducted on cell free extracts.

10.  When defendant Deanne F. Dabbs, a forensic evidence examiner at the Commonwealth of Virginia Department of Criminal Justice Services Division of Forensic Science conducted ABO blood group typing on the seminal fluid stains, the result was type A.

11.  When Mr. WASHINGTON was arrested in 1983, his blood and saliva were tested. He was a type-O secretor. Clifford Williams, the victim's husband, was a type-O non-secretor. Hence, presumptively, the ABO typing of the semen stains on the marital bed where she was stabbed and sexually assaulted provided compelling exculpatory evidence for Mr. WASHINGTON. If the semen on the blanket where she was raped was left by the rapist, and if WASHINGTON was the rapist, then the semen stains should have been type O.   They were not.

12.  To defeat the evidence's exculpatory value, Deanne F. Dabbs, without chemical, microscopic or other evidence that the seminal fluid stains were a mixture of fluids, and the prosecutor, non-party Commonwealth Attorney John Bennett, concocted an argument that Mr. WASHINGTON was not excluded by the evidence. They argued that the semen stains had nothing to do with the crime. Dabbs asserted that the semen stains were mixtures of the type-A secretor vaginal fluids of the victim and the non-secretor seminal stains of her husband.

13. Defendant Special Agent Reese Wilmore expressed serious reservations that the seminal fluid stains on the blanket had been inconsistent with Mr. WASHINGTON. After his meetings with defendant Dabbs, unnamed co-conspirator John Bennett reassured Special Agent Wilmore that notwithstanding the "apparent" inconsistency between the laboratory findings on the blanket and

the testing of Mr. WASHINGTON's blood and saliva, Mr. Washington was guilty.

## 1993-1994 DNA Testing of the Royal Blue Blanket

14. Years later, however, when it became clear as a result of early DNA testing that the semen stains on the blue blanket (item 25) could not have originated from a mixture which included either the husband or EARL WASHINGTON, JR., defendant, Jeffrey Ban, a forensic evidence examiner at the Commonwealth of Virginia Department of Criminal Justice Services Division of Forensic Science, argued for the first time, albeit falsely, that the stains were not mixtures and did not include the victim's vaginal secretions.  If defendant Ban had spoken consistently with the claim made by his co-worker Dabbs, the result would have been the undisputed exoneration of Earl WASHINGTON. Instead, Jeff Ban contradicted Dabbs's earlier position and claimed that the stains were simply semen stains that could have been deposited on the blanket at any time prior to the murder of Rebecca Williams. This new "scientific" explanation from the same laboratory fit neatly into a new prosecution theory concocted in 1994 that the blue blanket on the marital bed had a prior life as a "party blanket" which could account for the "random" semen stains on the blanket.

## 2000 DNA Testing on the Royal Blue Blanket

15. The 2000 testing revealed that the semen stains on the blue blanket were mixtures of DNA from Rebecca Williams and semen consistent with a convicted serial rapist, Kenneth Tinsley. Despite the fact that Tinsley stated that the only way his semen could have been deposited on the blue blanket is if the police had planted it there, defendant Ban continued to cling to his false claim because it was consistent with the prosecutor's theory. Defendant Ban's position was all the more false since the 2000 testing unambiguously identified the non-sperm fraction of the semen stains as belonging to Ms. Williams.

## Item #24 - Baby Blanket

16. In 1982, defendant Dabbs conducted blood typing on various stains found on the baby blanket. One of the stains contained the transferrin marker type CD, a marker found only in African

Americans and then in only 10 percent of that race. The victim was Caucasian. Defendant Dabbs appreciated the importance of this discovery since the assailant had been described by the victim before she died as a lone black man. Defendant Dabbs repeated the experiment to make sure there was no mistake. She secured the same result. So important was the CD type that initial suspects were excluded once it was determined they lacked the CD marker. Indeed, it was as a result of this discovery that lead the investigators to believe that the assailant had cut himself and bled on the premises during the struggle.   Their belief also explains why they made sure that Earl WASHINGTON's false confession included the "fact" that he cut himself during the struggle.

17. When Mr. Washington was arrested, blood was drawn and sent for testing. Mr. WASHINGTON's blood did not have the CD marker. Within days, there was a meeting between Dabbs, the prosecutor and the investigator.

18. Immediately after the meeting, but without any re-testing of the blood stains, the lab report was changed. With respect to the status on Item #24, the reference to Transferrin (Tf) CD was deleted and the transferrin testing now was described as "inconclusive." The change was made in bad faith solely to accommodate the prosecution's theory of the case that Mr. WASHINGTON was the perpetrator.

## The Shirt Found 6-8 Weeks After the Crime.

19. After Mr. WASHINGTON's arrest, he was shown a shirt found at the scene and was asked directly if it was his. When they had him try it on, it was tight.

20. Many hairs and hair fragments had been found in the pocket of the shirt. Hair was harvested from the head and face of every suspect, including Mr. WASHINGTON. All such hairs were microscopically compared to the hairs from the shirt with one exception.

21. Mr. WASHINGTON's hairs were not compared on the explicit instructions of one of the investigators.

## 1993-1994 DNA Testing of the Vaginal Swab Collected by the Medical Examiner

22.   In 1993 and 1994, under orders from the Governor, defendant Ban of the Commonwealth of Virginia Department of Criminal Justice Services Division of Forensic Science tested the blue blanket, Item #25, and the vaginal swab, Item 58, collected *post-mortem* by the Medical Examiner.

23.   The DNA testing on both items indicated that there was but one semen donor and that semen donor could not have been either EARL WASHINGTON or the victim's husband. Notwithstanding the fact that defendant Jeffrey D. Ban believed that the sperm from the vaginal swab and blanket came from one male, he issued a report in 1993 that suggested that two men could have contributed to the semen found in the vaginal swab, and if there were two men, then Mr. WASHINGTON could not be excluded.  That misleading report was shown to the Governor and, upon information and belief, was the basis for the Governor's choosing commutation as opposed to out right pardon.

24.   Had the Governor known the true facts, on information and belief, he would have pardoned Mr. WASHINGTON in 1994 on the basis of actual innocence.

## 2000 DNA Testing on the Vaginal Slides

25.   In 2000, the Governor ordered the Division of Forensic Science to conduct more sophisticated DNA typing on a number of items from the crime scene including the blue blanket and the vaginal slides that were made from the vaginal swab collected by the Medical Examiner during the autopsy.

26.   In his report dated September 8, 2000, defendant Ban reported that the sperm fraction on the blue blanket was consistent with Virginia convict Kenneth Tinsley. But on the vaginal slide, defendant Ban claimed the sperm fraction contained a mixture that not only excluded the husband and Mr. WASHINGTON, but also excluded Tinsley.  In other words, Ban incorrectly claimed that some man or men, other than Tinsley, had deposited the semen recovered from the victim shortly

7

after the fatal attack.

27. Upon information and belief, although the results excluded Mr. WASHINGTON, the fact that there was an unknown source of semen in the victim's vagina, prevented the Governor from basing his October 2000 pardon on actual innocence, a clause that other exonerees have received in their pardons.

28. Since October 2000, Mr. Washington has sought access to the biological evidence to pursue additional testing with the expectation that said testing would provide irrefutable evidence of Washington's innocence. The Virginia State Police and the defendants in this case have consistently opposed testing and when evidence in their possession was sought by Plaintiff, they successfully moved to quash.

29. Separate and apart from the biological evidence in the possession of defendants and the Virginia State Police, the Medical Examiner, in response to a different subpoena, produced for DNA testing, one of the two vaginal and one of the two labia slides that were made during the autopsy of Rebecca Williams. These slides had been returned to the Medical Examiner by the Division of Forensic Science at the completion of the 2000 testing. The slides were forwarded to Dr. Edward Blake, a nationally renowned forensic DNA scientist, who in the past had done DNA testing for prosecutors in other cases in the Commonwealth. (*See* Blake CV, attached as Exhibit C.)

30. Dr. Blake's test results, reflected in his report, attached as Exhibit B, proves once and for all that EARL WASHINGTON, JR. is completely innocent of the crimes for which he was convicted, and for which he came within nine days of execution. The test results identify Tinsley as the sole source of the sperm inside the victim's vagina. Finally, the test results demonstrate that the 2000 report of defendant Jeffrey D. Ban in which he claimed there was unknown semen was erroneous.

31. In October 2000, the Governor of Virginia pardoned Mr. Washington, not on the grounds that he was actually innocent of the rape and murder of Rebecca Williams, but on the grounds that

8

no reasonable jury would have convicted Mr. Washington if it had been provided with Mr. Ban's 2000 testing results. The Governor did not declare Mr. Washington an innocent man, apologize for his treatment, or welcome him back into the bosom of the State. Instead he was discharged from the penitentiary accompanied with nothing more than a $25.00 check from the Treasury of the Commonwealth.

32. Based upon the DNA report and the manner of Mr. Washington's pardon, defendant Culpeper Commonwealth's Attorney Gary Close declared Mr. Washington guilty of murder and rape of Rebecca Williams. Likewise, all of the defendants in this pending action have all asserted and continue to assert that, notwithstanding the pardon, Mr. Washington has not been determined to be factually innocent of the murder and rape of Rebecca Williams. Indeed, as recently as last month, former special prosecutor James L. Camblos, III told the court he still considered Mr. Washington a *suspect*.

33. Attached as Exhibits B and C to the Proposed Second Amended Complaint is the April 1, 2004, forensic report of Dr. Edward Blake, an internationally recognized expert of DNA analysis of bodily fluids and tissue, and his CV. Dr. Blake received from the Medical Examiner's Office a slide made from a swab of the victim's vaginal cavity. Dr. Blake used PCR testing to identify the genetic profile of semen found on this slide. He determined that, contrary to proposed defendant Ban's contention for the Virginia State Police that the vaginal contents reflected presence of DNA of an unknown third person, in fact the semen was deposited only by Kenneth Maurice Tinsley. This new evidence, coupled with the prior findings that Tinsley alone contributed the semen found on Item 25, the royal blue blanket, conclusively exonerates Earl Washington, Jr. for this capital crime and exposes forensic misconduct by proposed defendants Ban and Dabbs that warrants the instant motion to amend.

## ARGUMENT

It is axiomatic that leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). Here, based on the recent forensic testing by Dr. Blake, Mr. Washington can for the first time prove his innocence to a moral certainty.[1] Whatever "justice may require" surely includes the ability of a woefully wronged man to seek and accounting from those individuals such as proposed defendants Jeffrey D. Ban and Deanne F. Dabbs, who, knowing the truth or having the capacity to determine it, wilfully hid it, to his continuing great detriment.

The amendment relates back to the filing of the complaint since it addresses a matter which "arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading. . . ." Fed. R. Civ. P. 15(c)(2). The proposed claims against the proposed new defendants – for conspiracy to impede the course of justice under 42 U.S.C. §1985(2), and for their role in his false and wrongful imprisonment and intentional or reckless infliction of emotional distress, in contravention of state law – could not have been stated until now, since it is only now that the truth has been exposed and the conspiracy to keep it hidden, revealed. On the other hand, the proposed new counts do not change the theory of plaintiff's case, which from the start included a conspiracy count, albeit one which did not include the proposed new defendants because the evidence of their involvement and cover-up was only just revealed.

Addition of the proposed new parties at this time is appropriate since in relation to the matters at issue in this suit, they are closely related in business and interest to the current defendants, who were themselves previously sued for conspiracy to secure the wrongful prosecution and subsequent detention of Mr. Washington. *See generally, Bruce v. Smith*, 581 F. Supp.902 (W.D.Va. 1984). The new defendants would have had to know that if plaintiff's

---

[1]It is a matter of record, and not thought to be seriously disputed, that before her death Rebecca Williams told her husband that she had been attacked by one man only. The theory of a second perpetrator was belatedly invented by the state when faced with difficulties with its claims against Mr. Washington. Presumably, this figment of prosecutorial imagination will not further surface in the instant suit.

counsel had earlier learned of their misbehavior now set forth in the proposed amended complaint, they would have been named as defendants in the original suit. <u>See</u> <u>Ward Electronics Service, Inc. v. First Commercial Bank</u>, 819 F.2d 496, 497 (4th Cir. 1987) (granting motion to amend despite prior amendment and addition of new theories and finding lack of prejudicial surprise, where "proposed amendment was always in the possession of [the newly named defendant]" and only recently discovered).

## CONCLUSION

For these reasons, plaintiff's motion should be granted.

11

DATED: April 6, 2004.

Respectfully submitted,
EARL WASHINGTON, JR.,
By counsel

Robert T. Hall, #4826
Hall, Sickels, Rostant, Frei &
Kattenburg, P.C.
12120 Sunset Hills Road, Suite 150
Reston, Virginia 20190
(703) 925-0500
(703) 925-0501 (Fax)


Victor M. Glasberg, #16184
Kelly M. Baldrate, #43822
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA  22314
(703) 684-1100
(703) 684-1104 (Fax)


Barry A. Weinstein, #34093
P.O. Box 1287
Blairsville, Georgia 30514
(706) 745-1693
(706) 745-7491 (Fax)


Peter Neufeld
Debi Cornwall
Cochran, Neufeld & Scheck, LLP
99 Hudson Street, 8th Floor
New York City, NY 10013
(917) 237-0338
(212) 965-9084 (Fax)

Steven D. Rosenfield, Esq., #16539
913 East Jefferson Street
Charlottesville, VA 22902
434-984-0300
434-220 4852 (Fax)

Eric M. Freedman, Esquire
250 West 94th St.
New York, NY 10025
212-665-2713 (tel)
212-665-2714 (fax)

12

**Certificate of Service**

I hereby certify that a true and accurate copy of the foregoing document was served by U.S. Mail, first class postage prepaid, on April 6, 2004, to:

Brian K. Brake, Esq.
Keeler & Obenshain, P.C.
111 East Market Street
P.O. Box 1287
Harrisonburg, VA 22803

Richard K. Bennett, Esq.
Jeremy D. Capps, Esq.
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, VA 23255

Jack L. Gould, Esq.
10615 Judicial Drive, #102
Fairfax, VA 22030

William G. Broaddus, Esq
McGuire Woods
One James Center
901 East Cary Street
Richmond, VA  23219-4030

Steven D. Rosenfield