

CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

JUN 23 2004

JOHN F. CORCORAN, CLERK
BY _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| EARL WASHINGTON, JR., | ) | CIVIL ACTION NO. 3:02CV00106 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KENNETH H. BURAKER, CHARLES | ) | MEMORANDUM OPINION |
| JONES, HARLAN LEE HART, GARY L. | ) | |
| CLOSE, TERRY SCHRUM, CURTIS | ) | |
| REESE WILMORE,  LUTHER COX, | ) | |
| DENNY A. ZEETS,  TOWN OF | ) | |
| CULPEPER, VIRGINIA, | ) | |
| FAUQUIER COUNTY, VIRGINIA, | ) | |
| MARY L JONES, Personal Representative | ) | |
| of the Estate of C. B. Jones. | ) | |
| | ) | |
| Defendants. | ) | JUDGE NORMAN K. MOON |

I. INTRODUCTION

The Court has before it the following motions:

1)   Defendants Terry Schrum, Denny A. Zeets and Luther Cox's Motion to Dismiss on the Ground of Qualified Immunity, filed September 8, 2003;[1]

2)   Defendant Curtis Reese Wilmore's Motion for Summary Judgment Based on Qualified Immunity, filed November 26, 2003; and,

3)   Defendant Kenneth H. Buraker, Harlan Lee Hart, Charles Jones, and the Town of Culpeper's (collectively, the "Culpeper Defendants") Motion for Summary Judgment Based on Qualified Immunity, filed October 17, 2003.

---

[1] Though filed as a Motion to Dismiss, this motion will be treated as a Motion for Summary Judgment, as discussed in this Court's November 6, 2003 Order. *See* Fed. R. Civ. P. 12(b) ("If, on a motion asserting the defense numbered (6) to dismiss . . . matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56...").

1

On October 31, 2003, Plaintiff Earl Washington, Jr ("Washington") filed an Amended Complaint, alleging eleven causes of action against a number of police officers, the Town of Culpeper, and the Commonwealth Attorney for the Town of Culpeper. Washington voluntarily dismissed three causes of action on January 20, 2004. In an Order entered February 2, 2004, this Court granted in part and denied in part each of the above listed motions. Summary judgment was granted as to three of Washington's eleven causes of action, however Washington's first, fifth, sixth, seventh and eighth causes of action remain. Washington was granted additional time to conduct discovery related to the remaining causes of action. The Court now considers, in light of the additional evidence filed by the parties, whether summary judgment is appropriate as to Washington's first, fifth, sixth and seventh causes of action.

## II. LEGAL STANDARDS

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact...." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding whether there is a genuine issue of material fact, "the evidence of the nonmoving party is to be believed and all justifiable inferences must be drawn in its favor." *American Legion Post 7 v. City of Durham*, 239 F.3d 601, 605 (4th Cir. 2001). A mere scintilla of proof, however, will not suffice to prevent summary judgment; the question is "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party" resisting summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986) (internal quotation marks omitted).

2

Each of the defendant police officers in this case argue that they are entitled to qualified immunity. The threshold question in the qualified immunity analysis is whether or not an officer violated the plaintiff's constitutional rights. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the answer to that threshold question is yes, the officer is may still be entitled to qualified immunity if the right was not clearly established at the time of the events at issue. *Clem v. Corbeau*, 284 F.3d 543, 549 (4th Cir. 2002). "If the right was not 'clearly established' in the 'specific context of the case'--that is, if it was not 'clear to a reasonable officer' that the conduct in which he allegedly engaged 'was unlawful in the situation he confronted'--then the law affords immunity from suit." *Id.* (quoting *Saucier*, 533 U.S. at 201.) "Thus a court must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Conn v. Gabbert*, 526 U.S. 286, 290 (1999).

Government officials performing discretionary functions are generally protected from civil damages liability as long as their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Williams v. Hansen*, 326 F.3d 569, 583 (4th Cir. 2003). Qualified immunity should be resolved by the trial judge at the earliest possible stage of litigation. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (noting that qualified immunity is "an immunity from suit rather than a mere defense to liability" and "such pretrial matters as discovery are to be avoided if possible.").

## III. BACKGROUND

On June 4, 1982, Rebecca Lynn Williams ("Williams") was raped and murdered in her apartment in Culpeper, Virginia. Williams was stabbed 38 times. Before she died, Williams identified her attacker as a black male with a beard. On May 21, 1983, Plaintiff Earl Washington, a black male, was arrested by Sheriffs in Fauquier County, Virginia for breaking into the home of Helen Weeks, a 73 year-old woman, stealing a gun and money from her, beating her with a chair, and shooting his brother with the gun he stole from Ms. Weeks. As a result of these events Washington was sentenced to two consecutive 15-year prison terms. When Washington was being interrogated for these crimes he confessed to murdering Williams. The remaining issues in this case primarily involve the events surrounding Washington's arrest and interrogation.

On the night of May 20, 1983, and into the early morning of May 21, 1983, Washington had been drinking heavily. (Centor Report, attached as Exhibit 3 to Schrum and Zeets' Supplemental Brief.)[2] Washington later reported to an examining doctor that he had entered Ms. Weeks' home at 1:30 a.m. on May 21, 1983, in order to steal a gun. Ms. Weeks confronted him after he was inside the house and offered him money if he would leave. Washington took some money from her, struck her with a chair, and left. Washington claimed that he had nothing else to drink after the assault. (*Id.*; Washington depo. p. 69, attached as Exhibit C to Wilmore's

---

[2] All references to Schrum and Zeets' Supplemental Brief refer to the Response of Zeets and Schrum to Plaintiff's Supplemental Brief in Opposition to Qualified Immunity Motions, filed on March 15, 2004.

Supplemental Brief.)[3]

Early the next morning Washington was arrested for the assault on Ms. Weeks and, at roughly 8:40 am, Washington was interviewed by Terry Schrum ("Schrum") and Denny A. Zeets ("Zeets"), officers of the Fauquier County Sheriff's Office. (Washington Interview Notes, attached as Exhibit 13 to Washington's Supplemental Opposition.)[4]   This interview lasted until approximately 1:17 p.m., and during the course of this interview Washington admitted to a number of crimes, including the murder of Rebecca Williams. (*Id.*) After obtaining these confessions, Schrum and Zeets notified the Culpeper Police Washington had confessed and was in custody.

On the afternoon of the May 21, 1983, Harlan Lee Hart ("Hart"), a police officer of the Town of Culpeper Police Department, went to interview Washington. Washington had been up most of the night before, however, and was not properly rested. In order to allow Washington time to sleep, Hart did not question Washington that afternoon. (Hart depo. p. 14, attached as Exhibit 7 to the Culpeper Defendants' Supplemental Brief.)[5]   At about 10:00 a.m. the next day Hart, accompanied by Curtis Reese Wilmore ("Wilmore"), a special agent of the Virginia State Police, returned and began to interview Washington. (*Id.* at 10-20.) This interview lasted from

---

[3] All references to Wilmore's Supplemental Brief refer to Curtis Todd Wilmore's Supplemental Reply Memorandum In Support of Motion for Summary Judgment, filed March 15, 2004.

[4] All references to Washington's Supplemental Opposition refer to Plaintiff Earl Washington Jr.'s Supplemental Brief in Opposition to Qualified Immunity Motions of Defendants Schrum, Zeets, Hart and Wilmore, filed March 8, 2004.

[5] All references to the Culpeper Defendant's Supplemental Brief refer to the Culpeper Defendants' Supplemental Brief In Support of Summary Judgment, filed March 16, 2004.

roughly 10:00 a.m. to about 2:00 or 2:30 in the afternoon.  (*Id*.)  After Wilmore and Hart talked

to Washington for about an hour, they wrote out a statement in longhand, had it typed, and

Washington signed this statement as his confession to the murder of Williams.

Washington's trial began on January 18, 1984, and on January 20, 1984, the jury returned

a verdict of guilty, and recommended a sentence of death.  After a sentencing hearing on March

20, 1984, the trial judge entered a final order imposing the death sentence, and an execution date

was set for July 27, 1984.  Washington subsequently filed a number of appeals and a Petition for

a Writ of Habeas Corpus.  All were denied.

After his arrest Washington's IQ was tested, and in a "Psychological Report" dated

October 21, 1983, Dr. Arthur Centor states that Washington has an IQ of 69, "placing him in the

upper limits of mild mental retardation."  (Psychological Report p. 3, attached as Exhibit 5 to the

Culpeper Defendant's Supplemental Brief.)  In late September of 1993 DNA testing was

performed, and on October 25, 1993, the Virginia Division of Forensic Science issued a report

stating that the semen evidence recovered from the victim contained a genetic characteristic that

was not shared by the victim, her husband, or Washington.  Based on this evidence Governor L.

Douglas Wilder commuted Washington's sentence to life in prison.

After further developments in DNA technology made additional testing possible,

Washington successfully lobbied Governor James S. Gilmore, III to release forensic evidence for

new DNA testing.  Based on this testing, on September 7, 2000, Governor Gilmore issued a

pardon to Washington.

6

IV. DISCUSSION

**A) Count I - Due Process Violations**

Washington's first cause of action is labeled as a "coerced false confession" claim, and

Washington asserts that his due process rights were violated because defendants Terry Schrum

("Schrum"), Denny A. Zeets (Zeets), Curtis Reese Wilmore ("Wilmore") and Harlan Lee Hart

("Hart") coerced his confession and fabricated evidence against him. The Court will address the

coerced confession and fabrication theories separately.

> **i) In the context of this police interrogation, reckless conduct can support a due process claim**

As the Court discussed in its February 26, 2004 Memorandum Opinion, "[i]t is

well-settled that 42 U.S.C. § 1983, which provides a cause of action for the deprivation of federal

constitutional and statutory rights under color of state law, contains no independent state-of-mind

requirement. Rather, the requisite intent in a given case turns upon the standard necessary to

establish a violation of the underlying constitutional or statutory right." *Pink v. Lester*, 52 F.3d

73, 74 -75 (4th Cir. 1995) (citations omitted). Due process claims have historically "applied to

deliberate decisions of government officials to deprive a person of life, liberty or property."

*Daniels v. Williams*, 474 U.S. 327, 331 (1986) (emphasis in original). In *Daniels* the Supreme

Court held that protections of the Due Process clause are not triggered by negligence. *Id.* at 334-

36. Such protections can be triggered by deliberate or intentional acts. *See Sanders v. English*,

950 F.2d 1152, 1162 (5th Cir. 1992) (denying qualified immunity where evidence could support

a finding that defendant had deliberately ignored exonerating information indicating he had

arrested the wrong person); *Whitley v. Seibel*, 613 F.2d 682, 686 (7th Cir. 1980) (noting that

7

while negligent acts in an investigation do not violate due process, intentional acts do). "[W]hen injuries are produced with culpability falling within the middle range, following from something more than negligence, but less than intentional conduct," it is less clear that a claim is actionable under the Due Process clause. *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998). Police action in denying a liberty interest is sufficient to violate due process where it "shocks the conscience." *Id.* at 846.

There is no evidence on the record tending to show that Schrum, Zeets, Wilmore or Hart knew that Washington was actually innocent of the Williams murder when he was interrogated following his arrest on May 21, 1983. Washington's coercion claim is based on evidence that Washington is mentally retarded, drank heavily the night of May 20, 1983, and was tired when he was interrogated because he did not sleep the night before his arrest. Washington argues that, by asking a drunk, tired and mentally retarded suspect leading questions, the interrogating officers coerced his confession. There is no evidence that the officers intentionally took advantage of Washington's mental state at the time of the interrogation to solicit a false confession. Accordingly, Washington's coercion claim can only survive if, given the circumstances, reckless conduct is enough to shock the conscience.

The core concept of due process is "protection against arbitrary action." *Lewis*, 523 U.S. at 845. *Accord Wolff v. McDonnell*, 418 U.S. 539, 558 (1974) ("The touchstone of due process is protection of the individual against arbitrary action of government."). "[O]nly the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *Lewis*, 523 U.S. at 846 (quoting *Collins v. Harker Heights*, 503 U.S. 115, 129 (1992)). Deliberately indifferent conduct is enough to satisfy the fault requirement for due process claims based on the

8

medical needs of someone jailed while awaiting trial. *Id.* at 850 (citing *Barrie v. Grand County, Utah*, 119 F.3d 862, 867 (10th Cir. 1997); *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996)). In *Lewis* the Supreme Court found where officers have an opportunity to deliberate before acting, the officers decisions are given less deference when determining whether a suspect's due process rights were violated. *Id.* at 850. Traditionally, when the State "takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S., 189, 199-200 (1989). By contrast, in occasions calling for fast action, where the decisions are made "in haste, under pressure, and frequently without the luxury of a second chance," "a deliberate indifference standard does not adequately capture the importance of such competing obligations." *Whitley v. Albers*, 475 U.S. 312, 320 (1986).

In this case the police officers were conducting an interrogation of a suspect in a controlled environment. Because of the regulated setting of the interrogation, officers did not face pressure to make quick decisions, and had the opportunity to consult with others and consider their options before proceeding with the interrogation. The officers involved did not face pressure to make snap decisions. Accordingly, the Court finds that reckless conduct on the part of the interrogating officers is enough to support a due process claim for coercion in the context of a police interrogation.

Washington's fabrication cause of action is based on his allegation that police claimed he had knowledge of the Williams murder that he did not, and could not, have possessed at the time of interrogation. This theory is based on the deliberate unconstitutional actions of police officers, and such actions, if supported by fact, can form the basis of a due process claim. The officers did

9

not have to know that Washington was actually innocent for Washington's fabrication claim to survive. The fabrication claim is based on a deliberate constitutional violation, and the introduction of evidence showing that the interrogating officers knew Washington had not volunteered non-public information, but represented that Washington had, in fact, volunteered non-public information, will be sufficient for Washington's fabrication claim to survive summary judgment.

### ii) Washington has introduced evidence to support his fabrication claim against Wilmore

An official who fabricates evidence for use in a criminal proceeding violates the Fourth Amendment. *Miller v. Pate*, 386 U.S. 1, 7 (1967). The Court, in its February 2, 2004 Memorandum Opinion, has already determined that Washington alleged a fabrication of evidence claim, and that Washington's allegations, if supported by evidence, demonstrate a constitutional violation that is clearly established now, and was clearly established in 1983. Because Washington requested additional time for discovery, the Court's analysis in the February 2, 2004 Memorandum Opinion did not extend beyond Washington's allegations. In this Memorandum Opinion the Court will determine whether Washington has supported his allegations with evidence, and whether Wilmore or Hart violated a clearly established statutory right of which a reasonable person should have known. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Williams v. Hansen*, 326 F.3d 569, 583 (4th Cir. 2003).

In his Supplemental Brief in Opposition to Qualified Immunity Motions, filed on March 8, 2004, Washington concedes that "[s]ince Schum [sic] and Zeets did not have nonpublic information about the Culpeper homicide, they could not feed it to [Washington] in support of

10

the bare-bones confession they took, or misrepresent to prosecutors that the nonpublic

information originated with him," and withdraws his fabrication claim with regard to Schrum and

Zeets. (Washington's Supplemental Opposition, p. 2 fn. 2.)  Accordingly, the Court will address

the fabrication claim only so far as it relates to Wilmore and Hart.

   Washington's fabrication claim is based on evidence that his confession included

nonpublic facts.  Washington does not contend that the use of leading questions violates a

suspect's rights. (*Id.* at 10.)  The concern, rather, is that Wilmore and Hart later claimed that

nonpublic information originated from Washington.  Specifically, Washington accuses Wilmore

and Hart of "falsely documenting, misreporting to the prosecutor (and testifying) that the

nonpublic information originated with [Washington]." (*Id.* at 13-14.)  In support of these

accusations Washington introduces a portion of Hart's direct testimony in the criminal trial.

(Criminal Trial Transcript, attached to Washington's Supplemental Opposition as Exhibit 39.)

Hart, in this testimony, says that Washington stated that he understood his rights and that he had

a good nights sleep.  (*Id.*)  Hart also stated that Washington appeared to be rational and coherent

during the interrogation.  (*Id.*).  The portion of Hart's testimony Washington has produced does

not indicate that Hart or Wilmore fabricated any testimony related to the Washington

investigation.

   Washington also introduces a police report apparently written by Wilmore on May 24,

1983. (Police Report at 1, attached to Washington's Supplemental Opposition as Exhibit 16.)

This report states that Washington "gave pertinent information about the crime that no one knew

with the exception of himself."  The meaning of this statement is unclear.  Washington admitted

to Dr. Centor during his psychological evaluation that he "made up a lot of lies and told [the

investigators] that he had committed the crimes." (Centor Report, to Schrum and Zeets'

Supplemental Brief as Exhibit 3.)  For example, Washington informed police that he had

hitchhiked to Culpeper on the day of the crime with a person named "Billy." (Wilmore

Testimony at 597, attached as Exhibit C to Wilmore's Reply Memorandum in Support of

Summary Judgment, filed Jan. 5, 2004.)  Washington claimed that Billy was driving a blue Ford.

(*Id.*)  After the assault on Williams, Washington stated that he hitchiked back to Bealeton and

disposed of the murder weapon in the grass along Route 29.  (*Id.* at 626-37.)  Wilmore's

statement that Washington "gave pertinent information about the crime that no one knew with

the exception of himself" could refer to details of the crime that Washington made up, but a

reasonable juror could conclude that Wilmore's report contains an assertion that Washington,

when interrogated, divulged non-public information about the Williams murder.

The Court views this evidence in conjunction Wilmore's direct testimony.  (Criminal

Trial Transcript, attached to Washington's Supplemental Opposition as Exhibit 40.)  Wilmore, in

his direct testimony, describes the Washington confession as follows:

> I asked him what occurred at this point and he said I made her undress and why
> did you make her undress . . . I wanted to make love to her . . . did she want to
> make love with you . . . no, I was holding a knife on her.  Did you have sex with
> her?  One time.  Did you stick her with a knife?  I stabbed her once or twice
> before I left the apartment.  I asked him at this point, when you left the apartment,
> did you take anything from it, anything at all?  No.  Did you leave anything in the
> apartment?  My shirt.  At this point I asked Lt. Hart to go to his car, since we had
> a shirt we had been working with, and secure it.  He brought the shirt in, in a
> grocery type bag, and I took the shirt out and held it in front of Mr. Washington
> and asked him if it was his shirt.  He said yes, it was his.  I asked him how did he
> know that it was his and he continued, that was the shirt I had on that day.  I then
> asked him what makes it different or what makes it outstanding.  He said, there's
> a patch on the pocket. . . had been ripped off.

(Wilmore Direct Testimony, attached to Washington's Supplemental Opposition as Exhibit 40.)

12

There is evidence that Wilmore thought his testimony at Washington's criminal trial may have been misleading.  Washington has introduced a "Memo to Earl Washington File," (attached to Washington's Supplemental Opposition as Exhibit 36), which states:

> On the afternoon of October 20, I returned Wilmore's call and discussed the case with him at some length.  We discussed the pending DNA test and the implications of the various possible outcomes.  I tried to reassure Wilmore about his potential civil liability in any event.  He asked me about the outcome of the Faquier County charges which had been brought against Washington, and I told him what I knew about them to the very best of my recollection.  He also told me that he felt very uneasy about how the record reflects Washington's confession was obtained, particularly with respect to the incriminating shirt found at the scene which Washington identified as his.  Specifically, Wilmore said that he felt like either he or Hart must have mentioned the shirt to Washington before Washington said he left his shirt at the scene, and that his testimony in the record did not accurately reflect that the shirt had been first mentioned by the police.  I asked him then whether he or Hart had first told Washington where the shirt was found, and he said they had not.  I pointed out that Washington had been able to tell them that he had left the shirt on an open drawer in the dresser in the bedroom, which is where the shirt was in fact found.
>
> . . . .
>
> Wilmore told me he felt like he must have asked Washington something about the shirt, and that the transcript just did not read right.  It did not "go down" exactly as he said in the statement.  Wilmore said that he or Hart must have mentioned it - "did you leave the shirt?"  He could not say with 100% certainty that he remembered saying that to Washington, but he thinks that's the way it went down.
>
> Wilmore also told me that during the trial he and a psychiatrist of whose identity he was uncertain were both excluded as witnesses.  Wilmore approached the psychiatrist in the courthouse hallway and told him that Wilmore was having real problems with the case.  The psychiatrist told Wilmore that he should not worry about it, and Wilmore inferred from this that Washington had told the psychiatrist he had committed the crime.  Wilmore said he then "went in and game him both barrels."  When I asked Wilmore specifically whether he felt at the time of the trial that his testimony was inaccurate, he said absolutely not.  He did, however, agree that he had intended his testimony to be a mere general summary of the conversation with Washington, rather than a verbatim account of it.

Based on a letter written to Wilmore on October 27, 1993, it appears that the "Memo to Earl

Washington File" quoted above was written by Assistant Attorney General John H. McLees, Jr. (*See* Washington's Supplemental Opposition Exhibit 36 at 002076.)

This Memo does not establish that Wilmore or Hart fabricated evidence concerning the circumstances of Washington's confession, but it does show that Wilmore was concerned that the record did not accurately reflect Washington's confession. Specifically, ten years after his original testimony in the murder case against Washington, Wilmore was concerned that "his testimony in the record did not accurately reflect that the shirt had been first mentioned by the police." Wilmore, in his direct testimony, did state that he asked Washington if he left anything at the murder scene, and Washington replies "[m]y shirt."[6] It is significant whether the information regarding the shirt was first volunteered by Washington or whether the presence of the shirt at the murder scene was suggested by police. If Washington volunteered the information, it would appear that he had non-public information about the murder scene. If the police provided information about the presence of the shirt at the scene, Washington's confession that the shirt was his is much weaker evidence.

Taken collectively, Wilmore's May 24, 1983 police report, in conjunction with his direct testimony, constitute sufficient evidence to create a question of material fact with regard to the issue of whether Wilmore fabricated evidence against Washington. This conclusion is supported by the prosecutor's opening statement in Washington's criminal trial stating that Washington knew "a number of different things that could only have been known by somebody who actually had committed the offense." (Trial Transcript, attached to Washington's Supplemental

---

[6] "I asked him at this point, when you left the apartment, did you take anything from it, anything at all? No. Did you leave anything in the apartment? My shirt." (Wilmore Direct Testimony, attached to Washington's Supplemental Opposition as Exhibit 40.)

14

Opposition as Exhibit 44.)  The prosecutor's statement supports the inference that Wilmore reported that Washington possessed non-public information, and that the prosecution relied upon Wilmore's reports.

The Fourteenth Amendment cannot tolerate a criminal conviction based on the knowing use of false evidence. *Miller v. Pate*, 386 U.S. 1, 7 (1967).  The Court finds that there is a reasonable likelihood Wilmore's testimony regarding Washington confession that he had left his shirt at the Williams murder scene could have affected the judgment of the jury. *See generally Bramblett v. True* 59 Fed.Appx. 1, 14, 2003 WL 58283, **11 (4th Cir. 2003) (unpublished) ("The knowing use of perjured testimony constitutes a due process violation when 'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'") (quoting *Kyles v. Whitley*, 514 U.S. 419, 433, n.7 (1995)).  Accordingly, Washington has presented evidence sufficient for a reasonable juror to conclude that Wilmore knowingly used false evidence to pursue his conviction, and the fabrication claim against Wilmore must survive summary judgment.

Washington's claim against Hart, however, has weaker evidentiary basis.  Washington can support his fabrication claim against Wilmore with the May 24, 1983 police report and with Wilmore's direct testimony.  There is no such evidence with regard to Hart.  Even assuming that Hart asked Washington leading questions, the record supports the conclusion that Washington answered those questions, and confessed to the Williams murder.  The confession itself was not a fabrication.  If the interrogating officers deliberately represented that Washington had independent knowledge of nonpublic information about the Williams murder, that representation would constitute the fabrication of evidence.  Washington has not pointed to any evidence on the

15

record which indicates that Hart claimed Washington had nonpublic information about the

Williams murder.  Accordingly, summary judgment is appropriate as to the fabrication claim

against Hart.

### iii) Washington has not introduced evidence to support his coercion claim

It is well established that "certain interrogation techniques, either in isolation or as

applied to the unique characteristics of a particular suspect, are so offensive to a civilized system

of justice that they must be condemned under the Due Process Clause of the Fourteenth

Amendment." *Miller v. Fenton*, 474 U.S. 104, 109 (1985).  Unconstitutional "coercion can be

mental as well as physical, and . . . the blood of the accused is not the only hallmark of an

unconstitutional inquisition." *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960).  The relevant

question is:

> Is the confession the product of an essentially free and unconstrained choice by its
> maker? If it is, if he has willed to confess, it may be used against him. If it is not,
> if his will has been overborne and his capacity for self-determination critically
> impaired, the use of his confession offends due process.  The line of distinction is
> that at which governing self-direction is lost and compulsion, of whatever nature
> or however infused, propels or helps to propel the confession.

*Culombe v. Connecticut*, 367 U.S. 568, 602 (1961) (citation omitted).

Washington is mildly mentally retarded, and he argues that because of his retardation, his

lack of sleep on the night of May 20, 1983, and his drunkenness, his will was overborne by

Schrum and Zeets asking him leading questions during the May 21, 1983 interrogation, and by

Wilmore and Hart asking him leading questions during the May 22, 1983 interrogation.

There is evidence on the record, in the form of a Culpeper Police Department Incident

Report signed by Hart, that Washington had not slept the night before the May 21, 1983

interrogation by Schrum and Zeets. (Incident Report, attached to Washington's Supplemental Oppositon as Ex. 9.) There is also evidence on the record indicating that Washington is mentally retarded. There is no evidence to indicate that Schrum, Zeets, Wilmore or Hart, who have no specialized training in dealing with individuals who have mental disabilities, knew that Washington was mentally retarded at the time of the interrogations on May 21 and 22, 1983, and there is considerable evidence on the record to demonstrate that Washington attempted to compensate for his metal deficiencies by acting as though he understands when he does not, and by engaging in deferential behavior toward others. (Luckasson Evaluation of Earl Washington, at 9 ¶ 18, Attached to Washington's Supplemental Opposition as Ex. 2). Even Washington's own attorneys in 1983 had trouble determining that Washington was mentally retarded. (*See* Deposition of Gary Hicks, at 82-84, attached to Wilmore's Supplemental Brief as Ex. G; Letter from Gary Hicks to Sue Lewis, attached to Wilmore's Supplemental Brief as Ex. H.)

Additionally, Washington has introduced very little evidence to establish that he was drunk on the morning of May 21, 1983, and no evidence to establish that he was drunk on May 22, 1983. Attached as Exhibit 10 to Washington's Supplemental Brief in Opposition to Qualified Immunity, filed on March 8, 2004, is a transcript of what appears to be an interview between two doctors and a patient. This transcript is undated and has "Earl Washington" as a header, one of the speakers is identified as Dr. D, one of the speakers is identified as Dr. C, and one of the speakers is identified as Pt. Both the doctor and the patient are otherwise un-identified. At one point, midway through the first page of the transcript the following exchange takes place:

17

Dr. D:        OK, did you ever make a statement to police.

Pt:          I don't know.  When they picked me up I was drunk, I couldn't walk.

Dr. D:        So, do you know if you said anything about the rapes or you didn't say anything about the rapes.

Pt:          I couldn't _____.

Dr. D:        You couldn't.

Pt:          I don't.  I don't........

Dr. D:        You are not sure what you say.

Pt:          I am not sure.

This evidence cannot be relied upon to show that Washington was drunk when he was arrested, because Washington has failed to establish that he was the person who the transcript designates as "Pt".  To prove his that he was intoxicated during his interrogation, Washington has also produced the Centor Report discussed earlier and has produced his own deposition testimony in which he claims that he was "right drunk" and states that he had never been drunker before in his life on the night he assaulted Helen Weeks.  (Centor Report, attached as Exhibit 3 to Schrum and Zeets' Supplemental Brief; Washington Depo. at 129:5-18, attached to Washington's Supplemental Opposition as Ex. 11.)[7]  Washington does not state that he was drunk during his interrogation by Schrum and Zeets, and in his deposition Washington admits that after he left Ms. Weeks' house he had nothing to drink.  (Washington depo. at 61-62, Attached to Schrum and

---

[7]  Washington, in his supplemental brief, also relies on a Culpeper Police Department Incident Report signed by Hart to establish that Washington had been drinking heavily the night before the interrogation, and had not slept before his arrest.  (Incident Report, attached to Washington's Supplemental Brief as Ex. 9.)  This report does not discuss any details of Washington's arrest, and does not mention that Washington was drunk.

Zeets' Supplemental Brief as Ex. 4.)  At best, the evidence shows that Washington was drunk on the night of May 20, 1983 and into the early morning of May 21, 1983.  No evidence has been introduced to show how much Washington drank, or how long the effect of drinking that amount of alcohol would last.  Washington has not introduced evidence to indicate that he was drunk when his interrogation began on the morning of May 21, 1983.

Even assuming that the evidence is sufficient to establish that Washington is mentally retarded, had been drinking prior to the Weeks assault, and had not slept the night on May 20, 1983, the record is insufficient to establish constitutional liability in this case.  The police in this case did not cause any of the conditions that Washington complains created a coerced confession.  Washington was warned of his Miranda rights before the interrogation began.  There is no evidence that Washington suffered physical or psychological abuse at the hands of the interrogating officers.  To the contrary, there is evidence that Washington was not made any promises during his interview in exchange for his confession.  (Washington Depo. p. 69-70, Attached to Schrum and Zeets' Supplemental Brief as Exhibit 4.)  On the day of the first interrogation Washington was brought breakfast, that night he received dinner, and no one disturbed his sleep.  (Washington Trial Testimony at 92, 95, 96, Attached to Schrum and Zeeets' Supplemental Brief as Ex. 6.)  Additionally, there is evidence that Washington was allowed to use the bathroom, was given a drink when he asked for one, was given a cigarette, and was allowed to eat lunch.  (Virginia State Police Report, Attached to Schrum and Zeets' Supplemental Brief as Ex. 16; Hart's Direct Testimony p. 53, Attached to Culpeper Defendants' Supplemental Brief as Ex. 1;  Washington's Testimony at November 2, 1983 Suppression Hearing p. 16-17, Attached to Culpeper Defendants' Supplemental Brief as Ex. 3.)

Even if Schrum and Zeets knew that Washington was mentally disabled, an officer questioning a suspect of below normal intelligence can reasonably believe that such questioning is constitutional. *Colorado v. Connolly*, 479 U.S. 157 (1986) (In *Connolly* police took a valid confession from a suspect later diagnosed as suffering from chronic schizophrenia who was in a psychotic state at the time of his confession.). In order to violate the due process clause or the fifth amendment, there must be a <u>substantial element</u> of coercive police conduct. *Id.* at 164 (emphasis added). There is no element of coercive police conduct evident in the record. It appears that Schrum and Zeets simply interrogated Washington, he confessed to the crime against Weeks as well as to several other crimes, and Schrum and Zeets notified the appropriate authorities.

The evidence is even weaker with regard to the coercion claim against Wilmore and Hart. Wilmore and Hart did not begin their interrogation until May 22, 1983. Given that Washington had been in custody for more than 24 hours, even if the Court assumes that Washington had been drinking on the night of May 20, 1983, there is no evidence on the record tending to show that Washington was still drunk on May 22, 1983. Additionally, the record shows that Washington was not disturbed on the night of May 21, 1983, and was given the opportunity to get a full nights sleep. Washington's coercion claim against Wilmore and Hart must rely on the claim that interrogating officers asked a mentally retarded man leading questions. This interrogation took place after Wilmore and Hart were informed that Washington had already confessed to murdering and raping Williams.

The Court finds that there is no evidence on the record to support Washington's coercion claim against Schrum, Zeets, Wilmore and Hart. *See generally Robles v. Prince George's*

20

*County*, 302 F.3d 262, 271 (4th Cir. 2002) ("[N]ot every instance of inappropriate behavior on

the part of police rises to the level of a *federal* constitutional violation."); *Sacramento v. Lewis*,

523 U.S. 833 (1998) (holding that for due process violations, only the most egregious official

conduct can be said to be "arbitrary in the constitutional sense").  Even if there were evidence

sufficient to support Washington's coercion claim, the Court finds that a reasonable officer in the

position of Schrum, Zeets, Wilmore or Hart at the time of the Washington interrogation in 1983

would not have thought that the interrogating officers' actions were unconstitutional.

Accordingly, the Court grants the Defendants' motions for summary judgment with regard to the

coercion claim.

### B) Count Five (Conspiracy)

Washington's conspiracy claim is alleged against "all named and unnamed individual

defendants" and is based on the following alleged overt acts:

> A.     Defendants compelled MR. WASHINGTON to make a false confession
> by providing him with details of the crime he did not know and then
> relentlessly interrogated him until he regurgitated the falsely incriminating
> information they had fed him;
>
> B.     Defendants submitted false information including MR. WASHINGTON's
> fabricated "confession" in support of a murder and/or arrest warrant
> although they knew there was no probable cause;
>
> C.     Defendants withheld, destroyed and covered up exculpatory evidence of
> their misconduct, including tapes of their coercive interrogations; and
>
> D.     Defendants deliberately chose not to investigate leads that would
> undermine their fraudulent case against MR. WASHINGTON.

(Amended Complaint ¶ 105.)  To establish a civil conspiracy under § 1983, Washington must

present evidence that the defendants "acted jointly in concert and that some overt act was done in

furtherance of the conspiracy which resulted in [Washington's] deprivation of a constitutional

right." *Hinkle v. City of Clarksburg, W.Va.*, 81 F.3d 416, 421 (4th Cir. 1996).  With the

exception of the fabrication claim against Wilmore, each of these alleged overt acts is based on failed causes of action.  Additionally, Washington has not presented evidence that any defendant, named or unnamed, acted jointly in concert with Wilmore to perform any act in furtherance of a conspiracy to deprive Washington of any constitutional right.  Accordingly, the Court finds that summary judgment is proper as to Washington's conspiracy claim.

### C. Count Six (Supervisory Liability) and Count Seven (Failure to Train)

Washington's supervisory liability claim was initially alleged against Denny M. Slane ("Slane"), the Superintendent of the Virginia State Police, Luther Cox ("Cox"), Sheriff of Fauquier County, and Charles Jones ("Jones"), Chief of Police for the Town of Culpeper.  On January 21, 2004, Washington voluntarily dismissed all claims against Slane, so Cox and Jones are the only remaining defendants named in this claim.  Luther Cox supervised Terry Schrum and Denny A. Zeets, and Charles Jones supervised Kenneth H. Burraker and Harlan Lee Hart.  Each of Washington's claims against Schrum, Zeets, Burraker and Hart has failed.  Accordingly, Washington's supervisory liability claim against Jones and Cox fails.

In Count Seven of his Amended Complaint Washington alleges that the Town of Culpeper failed to adequately train and supervise its employees, exposing Culpeper to liability pursuant to *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 683 (1978).  The Court has granted summary judgment with regard to every claim against every defendant associated with the Town of Culpeper.  Accordingly, Washington's *Monell* claim fails.

22

## V. CONCLUSION

For the reasons discussed above, summary judgment is granted with regard to Washington's fifth, sixth and seventh causes of action. Partial summary judgment is granted with regard to Washington's first cause of action. Washington's fabrication claim against Wilmore survives.

The only remaining claims in this action are Washington's fabrication claim against Wilmore and Washington's state law defamation claim against defendant Gary L. Close, the current Commonwealth's Attorney for Culpeper County. Washington's claim against Wilmore is based on the actions surrounding the Williams murder investigation and Washington's trial for murder in 1983. Close was not the Commonwealth's Attorney during the 1980's, was not involved in the investigation of the Williams murder, and was not involved in Washington's subsequent prosecution for that murder. Washington's claim against Close is based on public statements made by Close in 2002 regarding Washington's exoneration. The Court has determined that Washington's remaining claims are unrelated, and thus Washington's fabrication claim against Wilmore shall be severed from Washington's defamation claim against Close. *See* Fed. R. Civ. P. 21 ("Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just. Any claim against a party may be severed and proceeded with separately."). *See also Corry v. CFM Majestic, Inc.,* 16 F.Supp.2d 660, 665 (E.D.Va.1998) ("[C]ourts should sever peripheral claims where the 'administration of justice would be materially advanced.'" (quoting *Wyndham Associates v. Bintliff,* 398 F.2d 614, 618-19 (2nd Cir.1968) *cert denied* 393 U.S. 977, 89 S.Ct. 444, 21 L.Ed.2d 438 (1968)). Furthermore, the Court declines to exercise supplemental

jurisdiction over Plaintiff's remaining state court claim.  28 U.S.C. § 1367.

The Clerk of the Court is hereby directed to send a certified copy of this Memorandum Opinion to all counsel of record.

An appropriate Order shall issue.

ENTERED: _____

U.S. District Judge

_June 23, 2004_

Date

24