CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

MAR 23 2006

JOHN H. CORCORAN, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

| | |
|---|---|
| EARL WASHINGTON, JR., <br><br> *Plaintiff,* <br><br> v. <br><br> KENNETH H. BURAKER, ET AL., <br><br> *Defendants.* | CIVIL ACTION No. 3:02-CV-00106 <br><br><br> MEMORANDUM OPINION <br><br><br> JUDGE NORMAN K. MOON |

This matter is before the Court on Defendant Curtis Wilmore's Motion for Summary Judgment, argued on February 1, 2006. For the following reasons, this motion is DENIED.

## FACTS

On June 4, 1982, Rebecca Lynn Williams was raped and murdered in her apartment in Culpeper, Virginia. Before she died, she identified her attacker as a black male with a beard. On May 21, 1983, Plaintiff Earl Washington, a black male, was arrested by sheriffs in Fauquier County, Virginia for unrelated crimes. During questioning, he confessed to murdering Williams. The Fauquier sheriffs contacted the Culpeper Police, and at about 10:00 am on May 22, 1983, Defendant Curtis Reese Wilmore, a special agent of the Virginia State Police, arrived with Culpeper police officer Harlan Lee Hart to interrogate Washington. The interview lasted several hours. After questioning Washington informally for about an hour, Wilmore requestioned him and took notes on the interview in longhand. As stated in those notes, Wilmore asked

1

Washington open-ended questions to which Washington responded with pertinent details about the crime. Washington was then read the statement, and he signed it.

Two days later, on May 24, 1983, Wilmore detailed these events in a police report, and in describing the first, unrecorded hour of the questioning, he stated, "[Washington] gave pertinent information about the crime that no one knew with the exception of himself." This statement serves as the basis of Washington's fabrication of evidence claim against Wilmore.

## PROCEDURAL HISTORY

Washington sued a number of the participants in his arrest and conviction under 42 U.S.C. § 1983, including Fauquier, Culpeper, and State law enforcement agents. On February 2, 2004, the Court granted summary judgment for the defendants on three of Washington's eleven causes of action. On June 23, 2004, the Court granted summary judgment on all remaining claims except for the fabrication of evidence claim against defendant Curtis Wilmore.[1] The case was stayed on August 9, 2004 pending Wilmore's appeal of his denial of qualified immunity, and the Fourth Circuit affirmed this Court's ruling on that issue on April 28, 2005. After further discovery, Washington sought to reinstate the fabrication of evidence charge against Harlan Lee Hart. The Court denied Washington's motion on December 21, 2005. Wilmore moved for summary judgment on December 20, 2005.

## DISCUSSION

Wilmore claims he is entitled to summary judgment on several grounds: (1) there is no evidence that he deliberately made a false claim that Washington possessed nonpublic information; (2) that his conduct did not constitute fabrication; and (3) there is no evidence that

---

[1] The Court also severed a state law defamation claim against defendant Gary Close.

Wilmore's statement, even if it was fabrication, was actually used against Washington or caused the deprivation of his rights. Wilmore argues that because his trial testimony cannot serve as the basis of liability, see *Washington v. Wilmore*, 407 F.3d 274, 283 (4th Cir. 2005), his situation is not materially different from that of Hart, against whom the Court refused to reinstate the fabrication claim; hence, if the Court found no basis for Hart's liability, it can find no basis for Wilmore's either. Wilmore also argues that Washington's claim is barred by the *Rooker-Feldman* doctrine.

### Rooker-Feldman

Wilmore's argument that the *Rooker-Feldman* doctrine bars Washington's claim has no merit. The Fourth Circuit already rejected this argument, see *Washington v. Wilmore*, 407 F.3d 274, 280 (4th Cir. 2005), and it has recently confirmed that a narrow interpretation of *Rooker-Feldman*'s reach now prevails. *Davani v. Virginia Dep't of Transp.*, 434 F.3d 712 (4th Cir. 2006). For *Rooker-Feldman* to apply, the loser in state court must file suit in federal court seeking redress for an injury actually caused by the state court decision itself. *Id.* at *1 (citing *Exxon Mobile Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005)). In this case, as the Fourth Circuit noted, "Washington challenges not his conviction but rather one aspect of the means by which that conviction was achieved." *Washington,* 407 F.3d at 280. Wilmore, however, argues that *Rooker-Feldman* applies based on Washington's statement in his brief, in which he asked for a denial of summary judgment so he can "be afforded the opportunity denied him in 1983: to have a jury determine the merits of his case based on authentic, reliable evidence rather than official distortions and lies." Pl.'s Br. in Opp'n to Summ. J., at 19. This rhetorical flourish

does not change the substance of Washington's claim, nor can it at this point; that claim remains based on the use of fabricated evidence to support the conviction, and not on the conviction itself. As the Fourth Circuit has already determined, *Rooker-Feldman* does not bar Washington's claim.

## Section 1983

### Applicable Standards

Summary judgment under Federal Rule of Civil Procedure 56 is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Terry's Floor Fashions, Inc. v. Burlington Indus., Inc*, 763 F.2d 604, 610 (4th Cir. 1985). In considering a motion for summary judgment, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the non-moving party." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (citations omitted).

The alleged fabrication at issue here is "Wilmore's false claim that Washington possessed nonpublic knowledge about the crime." *Washington v. Wilmore*, 407 F.3d 274, 282 (4th Cir. 2005). To survive summary judgment Washington must show that Wilmore fabricated evidence and that the fabrication resulted in a deprivation of Washington's liberty. *Id.* Washington must also show that the fabrication was deliberate. *Miller v. Pate*, 386 U.S. 1, 7 (1967); *Washington v. Buraker*, 322 F. Supp. 2d 702, 709 (W.D. Va. 2004).

4

Before applying these standards, the Court must address as a preliminary matter what effect, if any, the Order of December 21, 2005 denying Washington's motion to reinstate the fabrication claim against Hart may have. Wilmore treats this Order as dispositive of his case as well, but he overlooks the different procedural postures of the claims against Wilmore and Hart.

Washington's motion to reconsider asked this Court to reexamine its grant of partial summary judgment for Hart. A grant of partial summary judgment is an interlocutory order, and the power to reconsider interlocutory orders is committed to the discretion of the district court. *American Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514-15 (4th Cir. 2003). The court has plenary power to afford such relief as justice requires. *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1473 (4th Cir. 1991). Although the law of the case does not limit the court's power to reconsider an earlier ruling, it does guide the court's discretion. *American Canoe Ass'n*, 326 F.3d at 514-15. The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence, and because of the interest in finality, the court should grant motions for reconsideration only sparingly. *Dayoub v. Penn-Del Directory Co.*, 90 F. Supp. 2d 636, 637 (E.D. Pa. 2000) (citations omitted). *See also U.S. v. Duke Energy Corp.*, 218 F.R.D. 468, 474 (M.D.N.C. 2003) ("A motion to reconsider is appropriate when the court has obviously misapprehended a party's position or the facts or applicable law, or when the party produces new evidence that could not have been obtained through the exercise of due diligence.") (citations omitted); *Reich v. Hall Holding Co.*, 990 F. Supp. 955, 965 (N.D. Ohio 1998) ("The main grounds justifying reconsideration of interlocutory orders are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.") (citing *Petition of U.S. Steel Corp.*, 479

5

F.2d 489, 494 (6th Cir. 1973). These standards differ from those applicable to motions for summary judgment and implicate an interest in finality not present in those motions. Further, the court's broad discretion in reconsidering interlocutory orders means it can consider many factors, such as prejudice to the parties and the potential for delay, which do not enter into a summary judgment decision.

This Court initially granted Hart summary judgment because of the lack of evidence against him; in his motion to reconsider, Washington did not provide any further material evidence against Hart, or indicate a change in the controlling law or the need to correct a manifest injustice. Further, the Court noted in its Memorandum Opinion of December 21, 2005 that reinstating the claim against Hart at this late date would prejudice both Hart and Wilmore as well as further delaying the resolution of this case. Hence, the Court denied that motion. Given these factors, the Court's denial of a motion to reconsider an interlocutory order is not necessarily dispositive of Wilmore's summary judgment motion.

Even apart from the different considerations at work, the case against Wilmore is materially different from the case against Hart. The evidence shows that Wilmore wrote the police report at issue, Washington's Ex. No. 88, wrote down the question and answer session in the second hour of Washington's questioning, *id.*, and asked all of the questions to Washington in the first hour of the interrogation. Washington's Ex. No. 93, at 17-19. Although Hart was present and asked questions in the second hour of the interview, the evidence taken in the light most favorable to Washington points to Wilmore as the active party in the alleged fabrication. Thus, Wilmore's argument to the contrary, his situation is materially different from that of Hart.

**1. Deliberateness**

Wilmore argues that there is no evidence that he acted deliberately. In the Memorandum Opinion of June 23, 2004, this Court held, "The fabrication claim is based on a deliberate constitutional violation, and the introduction of evidence showing that the interrogating officers knew Washington had not volunteered non-public information, but represented that Washington had, in fact, volunteered non-public information, will be sufficient for Washington's claim to survive summary judgment." *Washington v. Buraker*, 322 F. Supp. 2d 702, 709 (W. D. Va. 2004). The officers need not have known that Washington was actually innocent, however, in order for the fabrication claim to survive. *Id.*

Washington argues that there is evidence in the record supporting the deliberateness of Wilmore's actions, and that in any event, intent is usually a jury question. Washington is correct that intent is sometimes best decided by a trier of fact. *See Hall v. Williams*, 960 F.2d 146, at *3 (4th Cir. 1992) (unpulished) (noting that a determination of someone's state of mind usually involves making factual inferences on which reasonable men might differ, and is thus a decision best left to the jury). It may be decided on summary judgment, however, where there is no evidence at all of the requisite intent. A plaintiff cannot reach the jury on bare allegations, but must present some evidence supporting the existence of the appropriate intent or state of mind. *See, e.g., White*, 150 Fed. Appx. at 199-200 (granting summary judgment where there was no direct or circumstantial evidence of the defendant's intent to fabricate evidence). The evidence that Washington offers to support Wilmore's intent to fabricate is: (1) that Hart testified that he and Wilmore took care not to inadvertently divulge facts, Wilmore acknowledged the need to avoid inadvertent contamination through leading questions, and Wilmore and Hart told McLees there was no inadvertent contamination of Washington; (2) that Wilmore wrote a memo to

7

McLees expressing concern that his trial testimony had not been completely accurate; (3) that Wilmore knew the proper way to interrogate a suspect and had been trained not to ask leading questions after the suspect's initial confession, but he violated these standards and asked Washington leading questions; and (4) that Wilmore said that, while excluded as a witness at trial, he spoke to a psychologist outside the courtroom, formed the false impression that Washington had confessed to him, and thus "went in and gave both barrels."

Although the evidence of intent is not overwhelming in this case, there is enough for a jury to infer that Wilmore acted deliberately. Even though this Court has held that the McLees memo alone is not enough to show that Wilmore fabricated evidence, a jury could find that it shows Wilmore was aware that his description of the interrogation was not accurate. Coupled with evidence that Wilmore knew the norms of interrogation and did not follow them, this could be enough for a jury to infer that Wilmore intended to fabricate evidence regarding Washington's knowledge. Thus, on the issue of deliberateness, Washington's claim reaches the jury.

### 2. Fabrication of evidence

In order to survive summary judgment, Washington must show that Wilmore actually fabricated evidence. Washington argues that the fabrication occurred in two steps: (1) Wilmore fed him nonpublic details of the crime, which he then confessed to; and (2) Wilmore then misrepresented to Bennett, the trial prosecutor, that Washington already knew this nonpublic information which only the perpetrator would know.[2] Both elements are necessary in order to

---

[2]In addressing this case, both this Court and the Fourth Circuit have heretofore focused on the police report as evidence of the fabrication. However, in his brief opposing summary judgment, Washington argues that Wilmore also drafted the Statement of Earl Washington in a

8

show that Wilmore fabricated evidence. As the Fourth Circuit noted in *White*, fabricated evidence sitting in a drawer is not by itself a constitutional violation– it must be used against the petitioner. 150 Fed. Appx. at 199 (citing *Landrigan v. City of Warwick*, 628 F.2d 736, 744 (1st Cir. 1980)).

Washington has shown enough to reach the jury in the first step of the alleged fabrication. In his affidavits and responses to interrogatories he asserts that he had no knowledge of the crime before his interrogation by Hart and Wilmore. *See* Washington's Counter-Statement of Facts ("WCSF"), at ¶ 43. The parties have spent a great deal of energy arguing what information was public or nonpublic at the time of Washington's interrogation, and whether he might have already known of the shirt from the media or his brother-in-law, who was also questioned by the police. Given Washington's statements that he knew nothing about the crime before his

---

misleading way, by making it seem that Washington provided the nonpublic information in response to Wilmore's open-ended questions. The misleading character of the Statement, which does not reveal that Washington was actually fed the information that he appeared to offer, also constitutes a fabrication, Washington argues.

Although this Court has ruled that Washington's confession itself is not a fabrication, *see Washington v. Buraker*, 322 F. Supp. 2d 702 (W.D. Va. 2004), it is clear from the context that that holding refers to the "I did it" element of the confession, rather than to the Statement of Earl Washington in its totality. Similarly, the Fourth Circuit based its conclusions on the evidence considered at the district court level. *See Washington v. Wilmore*, 407 F.3d 274, 282 (4th Cir. 2005) ("[T]he district court looked primarily to the May 23, 1983 police report"). Judge Shedd's concurrence aside, nowhere did the Fourth Circuit indicate that this Court should limit its consideration *only* to the police report. Indeed, the police report and Wilmore's version of the confession are two sides of the same coin: both create the same misleading impression that Washington had nonpublic information about the crime. Hence, the Court cannot consider the police report in isolation, but must also look to other allegedly misleading statements to the same effect, including Wilmore's drafting of Washington's confession itself.

9

interrogation, at best these arguments suffice only to create an issue of fact as to the information's source.

The question of whether and how this information was passed on to Bennett presents a somewhat more difficult question, however. At trial in both his opening statement and during rebuttal, Bennett emphasized that Washington had information about the crime that only the perpetrator would have known. The question, then, is whether he came to this conclusion independently or whether he learned it from Wilmore. Washington argues that Bennett must have learned this information from Wilmore, but he can offer no direct evidence as to how or when that occurred.

It is clear that Wilmore did not write the police report stating that Washington had nonpublic information until after Bennett decided to charge Washington, so Bennett could not have relied on this report, per se, in making that decision. Bennett also said that, while he did not recall whether he had received an investigative report in this case, it was not his practice to ask for them. Deposition of John C. Bennett, Wilmore's Ex. No. 79, at 154-57. The evidence indicates that the officers forwarded the police report to Bennett's office, but there is no evidence that he ever read it, and he has testified that he did not typically read such reports. *Id.*[3] Although Bennett reviewed the contents of Washington's Statement with Wilmore and Hart shortly after

---

[3]Washington also argues that Bennett's credibility is questionable because Bennett was aware that the outcome of this case might turn on his testimony and because he had previously lied in the course of Washington's post-conviction proceedings (he apparently stated that he was present at Washington's initial interrogation, a claim no one else has made and he has not reiterated. *See* Washington's Ex. No. 108.) Bennett's awareness of his testimony's importance does not necessarily impeach him as a witness, but an alleged false statement might. Where an issue turns on the credibility of a witness, it may be more fittingly resolved at trial than at summary judgment. *See* 10A Charles Alan Wright, Arthur R. Miller, & Mary K. Kane, Federal Practice and Procedure § 2727 n.55 (3d ed. 1998).

10

Washington's confession, *id.* at 159-60, he did not recall that either of the officers characterized the evidence or drew any conclusions from it. *Id.* at 163-64. Hart also testified that when he and Wilmore initially discussed the confession with Bennett, they did not go into the details of the confession; rather they gave Bennett a copy of Washington's statement, and he read it and came back with more questions for them to ask, although he does not recall the substance of the conversation now. Deposition of Harlan Lee Hart, Washington's Ex. No. 39, at 78-79. Further, Bennett has stated that he made the decision to charge Washington based on several factors unrelated to Washington's alleged nonpublic knowledge of the crime. Deposition of John C. Bennett, Wilmore's Ex. No. 79, at 98-100.

On the other hand, Bennett, Wilmore, and Hart had "many meetings," and Bennett relied on Wilmore and Hart to provide information about Washington's confession. Deposition of John C. Bennett, Washington's Ex. No. 102, at 217. More importantly, the officers were Bennett's *only source* of information as to the actual circumstances of the confession. *Id.* Given this evidence, one might reasonably infer that Wilmore at some point conveyed to Bennett the idea that Washington had important nonpublic information about the crime. It is thus unclear if Bennett drew his own conclusions regarding Washington's knowledge or relied on those offered by Wilmore. *See Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988) (holding that where police officers have been instrumental in the plaintiff's liberty deprivation, they "cannot escape liability by pointing to the decisions of prosecutors . . . whom they have defrauded."). Hence, a jury could plausibly decide for the plaintiff Washington on this question. Where the evidence is subject to conflicting interpretations or reasonable people might differ as to its significance, summary judgment is improper. *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.

1979); *Macy v. Trans World Airlines*, 381 F. Supp. 142, 145 (D. Md. 1974). In this case, reasonable people could differ on how Bennett learned that Washington had nonpublic information, and hence, summary judgment is inappropriate.

### 3. Causation

Finally, Washington must also prove that the deprivation of rights he suffered was causally related to the fabrication of evidence. The Fourth Circuit stated the standard on this point: "The proper inquiry . . . is whether Washington's conviction was a reasonably foreseeable result of Wilmore's initial act of fabrication– the police report." *Washington v. Wilmore*, 407 F.3d 274, 283 (4th Cir. 2005).

Causation is the most doubtful element of Washington's claim, and thus a closer look at the applicable standards of causation is necessary. Section 1983 provides in part, "Every person who . . . *subjects, or causes to be subjected* . . . any citizen of the United States . . . to the deprivation of any rights" shall be liable. 42 U.S.C. § 1983 (emphasis added). An examination of decisions on this issue shows that a court must begin a causation inquiry with the rule of causation used in ordinary tort liability. *See Monroe v. Pape*, 365 U.S. 167, 187 (1969) (recognizing the applicability to section 1983 claims of the rule of tort liability that "makes a man responsible for the natural consequences of his actions"), *overruled on other grounds by Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). *See also White v. Wright,* 150 Fed. Appx. 193, 199 (4th Cir. 2005) (unpublished) (stating that the plaintiff must produce evidence showing that "the alleged acts resulted in a deprivation of liberty or property. In other words, [plaintiff] must create an issue of fact as to the existence of a causal link between the conduct constituting the due process violation and the deprivation of a liberty or property interest").

12

In cases where a jury's decision is at issue, courts have approached causation by considering whether the alleged 1983 violation "influenced the decision." *Amato v. City of Richmond*, 875 F. Supp. 1124, 1145 (E.D.Va. 1994) (describing the "causal nexus" a plaintiff must show between the defendant's actions and the grand jury's decision in an unlawful arrest case). *See also Stemler v. City of Florence* 126 F.3d 856, 872 (6th Cir. 1997) (holding that causation requires a "reasonable likelihood the false evidence could have affected the judgment of the jury"); *Hedges v. Poletis*, 177 F.3d 1071, 1074 (8th Cir. 1999) (same). Because section 1983 liability has its roots in traditional tort liability, some courts have also considered whether the violation was a cause-in-fact of the plaintiff's harm. *See, e.g., Jones*, 856 F.2d at 993 ("[I]f George Jones would have been prosecuted even if the defendants had behaved properly, then they did not cause his injury and are not liable").

Whether there is sufficient evidence of causation to reach the jury is an issue of law to be determined by the court. *Charleston Area Med. Ctr. v. Blue Cross and Blue Shield of Ohio*, 6 F.3d 243, 247 (4th Cir. 1993). Where there is no evidence establishing a causal link between the defendant's conduct and the alleged liberty deprivation, summary judgment is appropriate. *See, e.g., White*, 150 Fed. Appx. at 200. The Court must thus consider whether Washington has produced sufficient evidence to create a jury question on the issue of causation.

Here, Wilmore himself did not directly state at trial that Washington had pertinent nonpublic information, but Bennett argued that point to the jury. Bennett himself is shielded by immunity, *Imbler v. Pachtman*, 424 U.S. 409, 427-28 (1976), but as noted above, Bennett's actions do not insulate Wilmore if Bennett himself was deceived by Wilmore's misrepresentations and relied on them. *See Jones*, 856 F.2d at 994. Similarly, although Wilmore's liability may not

13

be based on his trial testimony, *Briscoe v. LaHue*, 460 U.S. 325, 345-46 (1983), the fact that he testified at trial does not immunize him from liability for an earlier fabrication. *See Washington*, 407 F.3d at 283; *Snyder v. City of Alexandria*, 870 F. Supp. 672, 688 (E.D. Va. 1994) ("An officer who has violated an accused's rights, through conduct outside the courtroom, does not absolve himself of § 1983 liability by testifying about the charged conduct"); *Jones*, 856 F.2d at 994.

The Fourth Circuit suggested that when examining causation, this Court should consider whether "Wilmore's false statement in the police report influenced the decision to bring charges against Washington and the manner in which the prosecution was conducted." *Washington*, 407 F.3d at 283. Here, although it does not appear that the police report influenced the decision to bring charges, it is unquestionable that Washington's apparent nonpublic knowledge influenced the way in which Bennett prosecuted the case. Bennett's arguments to the jury placed great emphasis on Washington's knowledge of the details of the crime scene. In particular, Bennett stated in his opening, "You'll also hear the defendant told [police] a number of different things that could only have been known by somebody who actually had committed the offense." Washington's Ex. No. 1, at ¶ 43. In his rebuttal, Bennett said,

> **All the police did in this case was ask him the questions and he gave them the answers . . . . and I ask you to consider, second of all, only a person who was actually there, who actually did this, could have given them that statement, for several reasons.** He said that he kicked on the door, but the door was open. What's the testimony of Special Agent Wilmore who was there at the scene? There was no damage to the door. It apparently was, in fact, open. If the door had been locked or closed there would have been some damage to the lock . . . asked the defendant . . . didn't suggest to him . . . didn't ask him, was the radio on? They asked him, was the radio on or off and the defendant said the radio was on. What's the testimony of the people there on the scene the day that this happened? When they walked into the apartment there was a radio on. It was on FM 105. They asked the defendant to describe how it happened and what did the defendant say? That he took Rebecca Lynn Williams into the back bedroom and you'll recall the diagram of the house, the bedroom was all the way at the end of the hall, the back bedroom in the

14

apartment. **How could anyone know that, except the person who was there and the person who did it?** The last piece of evidence is that they asked him, did you take anything with you? No, didn't take anything with me. Did you leave anything there? Yes, I left a shirt. Why did you leave the shirt there? Because it had blood on it, and what was found in the apartment or later found in the dresser that was removed from the apartment to the mother-in-law's house, so she could separate the clothing and take out Rebecca's clothing and discard it and keep her son's clothing? There was a shirt and you heard the testimony . . . that when that shirt was handed over . . . it had red spots on it that appeared to be bloodstains. You've heard the testimony that when they took that shirt back and held it up in front of the defendant he said, yes, that was the shirt I was wearing. They asked him, how do you know that was your shirt? Because the patch was missing over the left top pocket. **Now how does somebody make all that up, unless they were actually there and actually did it?** I would submit to you that there can't be any question in your mind about it, the fact that this happened and the fact that Earl Washington Junior did it.

Washington's Ex. No. 111 (emphasis added). Given that a jury could reasonably conclude that Bennett gained his information from Wilmore's misleading statements, *see* Part 2, *supra*, a jury could reasonably conclude that those statements influenced the conduct of the prosecution.

There is also sufficient evidence for a jury to find that the fabrication of evidence influenced not just the conduct of the prosecution, but the jury's decision. The main evidence presented at Washington's trial linking him to the crime was his confession and the shirt found at the scene. Bennett's emphatic arguments to the jury and the misleading nature of the confession itself make Washington appear more culpable than he would otherwise have, had it been clear to the jury that he had no prior knowledge of the crime. Although Washington's testimony at his trial certainly did nothing to improve his situation, the truly damning evidence was not just his confession, but the details it revealed. Although it is impossible to say at this point what factors governed the trial jury's decision, reasonable people examining the evidence could certainly find that the misleading statements regarding Washington's knowledge of the crime scene influenced the verdict.

15

Washington's argument for causation is built largely on inference, but he is entitled to the benefit of all reasonable inferences on a motion for summary judgment. The facts certainly do not compel his reading of causation, but something more than a scintilla of evidence exists in support of his claim. Hence, summary judgment is improper on the causation element as well.

**Conclusion**

Plaintiff Earl Washington is entitled to reach the jury on his fabrication of evidence claim against Defendant Curtis Wilmore. Taking all facts in the light most favorable to Washington and granting him the benefit of all reasonable inferences, he has sufficiently presented evidence from which a reasonable jury could conclude that Wilmore acted deliberately, that he fabricated evidence, and that his actions had a sufficient causal link to Washington's conviction. Hence, the defendant's motion for summary judgment must be DENIED.

An appropriate order shall issue this day.

ENTERED: _____
U.S. District Judge

March 23, 2006
Date