

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

| | |
|---|---|
| EARL WASHINGTON, JR., <br><br> *Plaintiff,* <br><br> v. <br><br> CURTIS TODD WILMORE, in his capacity as personal representative of the Estate of CURTIS REESE WILMORE, <br><br> *Defendant.* | CIVIL ACTION No. 3:02-CV-00106 <br><br><br> MEMORANDUM OPINION <br><br><br> JUDGE NORMAN K. MOON |

This matter is before the Court on Defendant's Motions for Judgment as a Matter of Law under Rule 50, filed on May 22, 2006, and for New Trial under Rule 59, filed on May 22, 2006. For the following reasons, both of these motions shall be denied.

## I

The facts and procedural history of this case leading up to trial have been extensively described in previous orders and need not be recounted here. This case was tried before a jury from April 24 to May 4, 2006. At the close of Plaintiff's evidence, Defendant moved for a directed verdict, and the Court denied the motion. On May 5, 2006, the jury returned a verdict for Plaintiff Earl Washington. Wilmore now moves for judgment as a matter of law and for a new trial.

# II

## A

Rule 50 of the Federal Rules of Civil Procedure authorizes a court to grant a party judgment as a matter of law where there is "no legally sufficient evidentiary basis for a reasonable jury for find" for an opposing party on an issue. Fed. R. Civ. P. 50. In considering a Rule 50 motion, the Court simply determines whether substantial evidence supports the jury's verdict. *Bonner v. Dawson*, 404 F.3d 290, 295 (4th Cir. 2005). The court must view the evidence in the light most favorable to the non-moving party, *Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 866-67 (4th Cir. 1999), and draw reasonable inferences in that party's favor. *Gibson v. Old Town Trolley Tours of Washington, D.C., Inc.*, 160 F.3d 177, 181 (4th Cir. 1998). The court may not retry factual findings or credibility determinations made by the jury, but instead must assume that testimony presented by the non-moving party is credible unless "totally incredible on its face." *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998) (citations omitted). Further, the court must disregard evidence favorable to the moving party that it is not required to believe and should only give credence to evidence favoring the movant that is uncontradicted and unimpeached, at least to the extent that it comes from disinterested witnesses. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000) (citations omitted).

In cases where causation is shown through circumstantial evidence, the question of sufficiency of the evidence "goes simply to the reasonableness of drawing the necessary inference of causation from the indirect evidence." *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 241 (4th Cir. 1982). "Sheer speculation," however, cannot form the basis for a verdict, *Gibson*, 160 F.3d at 181, and inferences must be within the range of reasonable probability,

2

rather than simple possibility. *Lovelace*, 681 F.2d at 241-42; *Ford Motor Co. v. McDavid*, 259 F.2d 261, 266 (4th Cir. 1958) ("Permissible inferences must still be within the range of reasonable probability, however, and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture."). Judgment as a matter of law notwithstanding the jury verdict is appropriate only where, without re-weighing the evidence, "there can be but one reasonable conclusion as to the proper judgment" *Benner v. Nationwide Mut. Ins. Co.*, 93 F.3d 1228, 1234 (4th Cir. 1996) (citation omitted).

## B

Wilmore argues that there is no substantial evidence to support the jury's verdict that Curtis Reese Wilmore fabricated evidence, that he did so deliberately, or that the fabrication caused Washington's injury. In particular, he argues that Plaintiff presented no evidence that Wilmore's statement in the May 24, 1983 police report ("Washington gave pertinent information about the crime that no one knew with the exception of himself") was false. Rather, Washington gave a wealth of information known only to himself regarding how he arrived at and left the crime scene, who accompanied him, and how he acquired and disposed of the murder weapon. All of this information was known only to Washington, of course, because he had made it up. On the other hand, many individuals inside and outside of law enforcement knew the actual details of the murder that Washington confessed to, and thus these details cannot be the "pertinent information" Wilmore referred to. Further, Wilmore argues that there is no evidence Bennett ever read the police report at issue, nor that he relied on the report in prosecuting the case. Finally, Wilmore argues that there is no evidence of an intent to fabricate; given that Wilmore was not

3

required to ask non-leading questions or record interviews, the fact that he did not do so is simply not probative.

After examining the record, the Court determines that there was sufficient evidence for a reasonable jury to find that the statement in the May 24, 1983 police report was a fabrication. Although Washington gave a great deal of false detail about the crime, Plaintiff presented expert testimony by Richard Leo that, from a police standpoint, "pertinent" information is that which the police have corroborated. This testimony is not "totally incredible on its face," *Cline*, 144 F.3d at 301, and thus a reasonable jury is entitled to credit it. Plaintiff also offered substantial evidence that Washington could not have known any actual "pertinent" information, because he was innocent of the Williams murder. Given this evidence, a reasonable jury could find it more probable than not that the statement that Washington gave "pertinent" information was a fabrication.

Wilmore argues, however, that the statement that Washington presented information "no one knew with the exception of himself" must be read literally. Because the only information Washington presented that was known only to himself was the information he himself had invented, and not the details he learned from Wilmore, Plaintiff's definition of "pertinent" contradicts the actual statement in the police report and the jury should not be allowed to believe it. The jury, however, may use its own knowledge and common sense in interpreting testimony and evidence. *See, e.g., Head v. Hargrave*, 105 U.S. 45, 49 (1881); *Cronenburg v. United States*, 123 F. Supp. 693, 701 (E.D.N.C. 1954) (citation omitted). If Washington presented to Wilmore information that was "known only to himself," Wilmore would have no way of knowing whether or not this information was true, and although it might provide the potential for corroboration, it

4

would not offer any definitive evidence of guilt at the time of the interrogation. In contrast, "pertinent" as defined by Washington's experts places a gloss on this statement by suggesting that the information offered already had some meaning for the investigation. A reasonable jury could determine that this is the kind of information that merits mention in a police report. It was therefore not unreasonable for the jury to find that "pertinent information no one knew with the exception of himself" meant essentially "information about the crime not known to the general public."[1] Washington's interpretation of this statement is not the only possible interpretation, but placed in its proper context it is at least one probable interpretation. The jury's verdict was based on more than sheer speculation or a scintilla of evidence, and the mere fact that the statement might be susceptible to more than one interpretation does not render the jury's verdict unreasonable as a matter of law. *See, e.g., Gairola v. Virginia Dep't of Gen. Serv's.*, 753 F.2d 1281, 1285 (4th Cir. 1985) (holding that the test for a directed verdict is whether "there can be but one conclusion as to the verdict that reasonable jurors could have reached.").

C

There was also sufficient evidence for the jury to find that Wilmore knowingly and intentionally fabricated evidence. As many courts have noted, intent must almost always be proven by circumstantial evidence. Although Wilmore was not *required* to record interviews or to formulate his questions in a particular way, the fact that he did not record the interview and that he asked leading questions is certainly open to the jury's consideration. Harlan Lee Hart

---

[1] Indeed, it is not clear that Wilmore's literal interpretation of the statement is any less contradictory. The majority of the facts that Washington made up would have been known to other people as well, had they been true: for instance, "Billy" would have known that he picked Washington up and drove with him to Culpeper.

5

testified that he was aware of no logistical reason why Wilmore could not have taped the confession, and Plaintiff's expert Leo testified that there was no reason for Wilmore to tape some interviews and not others. Indeed, the Inbau and Reid manual recommends either recording all interviews or none. Further, Washington presented evidence from which the jury could infer that Wilmore had been trained by the Reid Corporation, which taught officers not to reveal all of the details about a crime. This evidence thus offered sufficient grounds for the jury to infer that Wilmore's fabrication was deliberate.

## D

Finally, Plaintiff presented sufficient evidence to show that Wilmore's fabrication caused Washington's conviction. Not only could a reasonable jury infer that Bennett read or knew the contents of Wilmore's report, but they could also reasonably infer that that report influenced Bennett's prosecution of the case and the jury's verdict. Hart testified that it was his and Wilmore's practice to forward their reports to the prosecutor's office, and that the May 24 police report was the only comprehensive report he was aware of describing the events of May 22. Further, Bennett testified that he had many meetings with Wilmore, and Wilmore never told him anything inconsistent with the contents of the report. Although Bennett testified that he drew his own conclusions as to how to conduct the case, he also admitted that in drawing those conclusions he relied on "raw data" supplied by investigators. Further, a jury could find that Plaintiff impeached Bennett's credibility by presenting evidence that he had previously lied about having witnessed Washington's confession. The jury was thus not required to credit his statements that he had formed his own conclusions as to Washington's knowledge.

6

Further, circumstantial evidence supports the finding that Wilmore's fabrication influenced the conduct of the prosecution. Bennett mentioned Washington's possession of non-public information in his opening statement, and his rebuttal at closing was a powerful formulation of how Washington's independent knowledge of these pertinent facts connected him to the crime. Although these statements were not evidence, they were nonetheless persuasive argument, and given the large role they played in Bennett's closing, a reasonable jury could have found it more probable than not that they were a cause of Washington's conviction.

Wilmore argues that so many inferences were required by the jury to conclude that the police report influenced the conviction that they have ceased to be credible. A determination of what constitutes a reasonable inference on which a jury may rely is a common problem in Rule 50 motions, and the definition of the range of reasonable inferences depends on the particular circumstances of each case. 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2528 (2d ed. 1987). However, the mere fact that more than one inference is required for the jury to reach its conclusion does not render that conclusion unreasonable. *See Shelton v. Jones*, 356 F.2d 426, 428 (4th Cir. 1966) (holding that on a motion for directed verdict, the court must "indulge *every* reasonable inference in [the plaintiff's] favor.") (emphasis added). Similarly, the mere fact that conflicting inferences are possible from the facts alleged does not render the verdict unreasonable. It is the province of the jury to resolve conflicting inferences from circumstantial evidence, so long as those inferences are within the range of reasonable probability. *Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co.*, 427 F.2d 862, 868 (4th Cir. 1970). Here, in light of all the evidence and allowing the jury all reasonable inferences, it is clear that the jury could reasonably infer that Bennett had seen the police report and that Wilmore's

7

fabrication influenced his prosecution of the case and was a cause of Washington's conviction. There was thus sufficient evidence for a reasonable jury to find that the statement in the police report was a fabrication, that it was deliberate, and that it was a cause of Washington's conviction. Wilmore's motion for judgment as a matter of law fails.

## III

### A

Wilmore also moves for a new trial under Rule 59. Under Rule 59, a trial judge may weigh the evidence and consider the credibility of witnesses and may order a new trial, even where the verdict is supported by substantial evidence, if it would result in a miscarriage of justice. *Poynter v. Ratcliff*, 874 F.2d 219, 223 (4th Cir. 1989). Here, Wilmore seeks a new trial based on two grounds: the Court's error in granting Plaintiff's *Batson* motion, and the Court's error in admitting Curtis Reese Wilmore's preliminary hearing and trial testimony.

### B

Wilmore argues that the Court erred in its ruling on the *Batson* question. Specifically, he argues that a race neutral reason existed for Defendant's strike of Juror 100260151, because she was the only juror who responded affirmatively to Question 92 in the pretrial juror questionnaire ("Do you believe that if you disagreed personally with the jury instructions given to you by the judge at the end of the case, that you would tend to base your verdict on your personal views of the case?"). In addition, she stated on her questionnaire that she believed, "People should be compensated when wrongfully convicted," and that if Defendant were guilty "he should serve time." Further, Wilmore argues that the Court conducted the wrong inquiry in examining the

8

Plaintiff's *Batson* motion.

There are three steps in a *Batson* inquiry: first, the party opposing the peremptory challenge must make out a prima facie case of discrimination; second, if a prima facie case is made, the burden shifts to the challenge's proponent to offer a race-neutral explanation for the challenge; and third, the trial court must then determine whether the opponent of the strike has proved purposeful discrimination. *Matthews v. Evatt*, 105 F.3d 907, 917 (4th Cir. 1997). Although the race neutral reason offered at stage two need not be minimally persuasive or even plausible, the court may consider the persuasiveness of the justification at the third stage. *Purkett v. Elem*, 514 U.S. 765, 768 (1995). At that stage, implausible justifications may be found to be pretexts for purposeful discrimination. *Id.* The ultimate burden of proving purposeful discrimination, however, rests with the opponent of the peremptory strike. *Matthews*, 105 F.3d at 917. Once the court has ruled on the ultimate issue of purposeful discrimination, the issue of whether the prima facie case was made becomes moot. *Hernandez v. New York*, 500 U.S. 352, 359; *Davis v. Baltimore Gas & Elec. Co.*, 160 F.3d 1023, 1027 (4th Cir. 1998).

A new trial under Rule 59 is not warranted on the *Batson* issue because the race neutral reasons offered by Defendant were not persuasive, and Plaintiff carried his ultimate burden of proving purposeful discrimination. When the parties originally argued the *Batson* motion, counsel handling jury selection for Defendant stated that he made the decision to strike Juror 100260151 before seeing her and learning her race. This statement and the affidavit to the same effect later filed are dubious, given that the clerk's office sent an official venire list to both parties before trial listing information about each prospective juror, including his or her race. Both parties put substantial effort into jury selection, and clearly both sides had reviewed the

9

detailed questionnaire that was sent out to the pool. It is thus difficult to fathom how defense counsel in charge of selecting the jurors would have overlooked the potentially useful information sent by the clerk's office. Further, as the Supreme Court noted in *Batson*, the court is not required to credit a simple affirmance of good faith, *Batson v. Kentucky*, 476 U.S. 79, 98 (1986), and here, the circumstances of this case suggest that the defense counsel must have been aware of the juror's race before voir dire began.

In addition, Defendant's other arguments offering race neutral reasons for striking the juror are unpersuasive in light of all the facts. The juror's statement that if Wilmore were guilty he "should serve time" evinces little more than a confusion about criminal and civil standards, a confusion shared by many of the prospective jurors. Nor does this statement demonstrate an inappropriate desire for retribution, given that the juror also stated that she hoped Wilmore was innocent and that many of her other responses indicated a high regard for law enforcement.

Similarly, other white jurors made statements similar to Juror 100260151's statement that "people who are wrongfully convicted should be compensated." At least two white jurors actually seated made statements essentially the same as the disputed juror's statement, with no attempt made to strike them. Although *Batson* is not necessarily violated when two venire members of different races give the same responses and one is struck while the other is not, *Howard v. Moore*, 131 F.3d 399, 408 (4th Cir. 1997); *Matthews*, 105 F.3d at 918, the court may consider this evidence in making its third-step determination of purposeful discrimination. *Miller-El v. Dretke*, 125 S.Ct. 2317, 2325 (2005); *Howard*, 131 F.3d at 408 ("this circumstance may give rise to an inference of pretext.").

10

Even the juror's statement in her questionnaire that she would tend to follow her personal feelings in making her decision does not detract from the Court's conclusion. As an initial matter, it is clear that she renounced this assertion during voir dire. Wilmore argues, however, that the Court informed the parties that they could rely on the statements in the questionnaire. This is true as far as it goes, but nowhere did the Court suggest that they would be given dispositive weight or accorded any more force than any other statements made by the jurors. In chambers, before beginning the trial, counsel and the undersigned discussed several issues, and it is the undersigned's recollection that as the meeting was ending and the attorneys were about to leave chambers, Mr. Broaddus asked something to the effect of whether the parties could rely on the questionnaire answers in making their strikes. The undersigned replied that the questionnaires were part of the record, as would be the voir dire. At that point the significance of this question was not immediately clear to the undersigned.

In light of later events, however, these facts suggest that the defense knew at least by the meeting in chambers that Juror 100260151 was black,[2] had decided to strike her, and wished to avoid any voir dire answers that would cast doubt on their proposed reasons for striking her. Other than to avoid a *Batson* challenge, there is no conceivable reason for counsel to be concerned about the use of the questionnaire answers. In other words, the defense adopted a strategy of ignoring or limiting the importance of the statements made during voir dire so as to preserve its pretextual reasons for striking the juror.

---

[2] It is the undersigned's recollection that the meeting occurred after the jurors were seated in the courtroom. Because they were seated alphabetically, counsel would have been readily aware of their identities by at least that point.

11

Considering the juror's own background in law enforcement and corrections, her family's participation in the field, and her statement that she would give more weight to a law enforcement officer than to a lay witness, she appeared to have been an ideal juror for Wilmore. Indeed, it seems unlikely that Defendant would have sought to strike a white juror with these credentials. Further, any suggestion that she would follow her own personal feelings rather than the Court's instructions seems more likely to evince a bias *in favor of* Wilmore rather than against him. Finally, a white juror who was seated without objection stated in his questionnaire that he was unsure whether he would be able to follow the Court's instructions. Although he did not answer the question affirmatively, as did Juror 100260151, his response to this question should still have raised a red flag for defense counsel had this issue indeed been as dispositive as they argue. In sum, the race-neutral reasons offered by Defendant for striking Juror 100260151 are pretextual and unconvincing, and the Court found that Plaintiff carried his ultimate burden of proving purposeful discrimination.

Defendant also argues that because the Court initially applied the wrong test in considering the *Batson* issue, a new trial should be ordered. Although the Court did not properly articulate the standard at the time of the initial *Batson* motion, this was due to a simple misstatement rather than to a genuine misunderstanding of the law. The Court was well aware of the proper standard, and it was upon that standard that it based its initial *Batson* decision. Further, the Court explicitly considered the issue according to the proper *Batson* standard during the course of the trial and reaffirmed that Defendant's reasons for striking the juror were pretextual and that Plaintiff had carried his ultimate burden of proving purposeful discrimination.

The Court also notes that the defense counsel did not object to the Court's application of

12

*Batson* when the initial motion was made. Numerous courts have held that objections must be made during trial to be preserved; a party cannot "entrap a successful plaintiff by reserving its fire" and waiting to see the outcome, especially when bringing the error to the court's attention would have led to its immediate correction. *Reck v. Pacific-Atlantic S.S. Co.*, 180 F.2d 866, 870 (2d Cir. 1950); *Ford v. United Gas Corp.*, 254 F.2d 817, 818 (5th Cir. 1958). Further, an objection on one ground will not allow the objecting party to rely on other grounds on appeal. *Rice v. Community Health Ass'n*, 203 F.3d 283, 286 (4th Cir. 2000). Although the defense properly preserved its substantive *Batson* objection, it never objected to the standard applied by the Court, a different issue. Upon the Court's decision to grant the *Batson* motion, all defense counsel said was, "Note the exception, your honor," a statement that appears to refer to the outcome of the *Batson* motion rather than to the standard applied. Although the Court does not rely on this ground in denying the Rule 59 motion, it does note that an argument for waiver therefore exists.[3]

C

Defendant also argues that he is entitled to a new trial based on the Court's erroneous admission of Curtis Reese Wilmore's preliminary hearing and trial testimony, in violation of *Briscoe v. LaHue*, 460 U.S. 325 (1983), and the Fourth Circuit's earlier ruling in this case,

---

[3]Plaintiff also argues that Defendant has waived its objection to the *Batson* issue because during the Court's reconsideration of the issue, defense counsel stated, "I'm not sure there is an answer other than just to go forward as we are." Defendant's failure to agree to any proposed solutions does not constitute an invitation of error. Counsel for Defendant voiced an objection at the initial *Batson* hearing, and whatever else may have occurred, there was no invited error on their part based on their later statement.

13

*Washington v. Wilmore*, 407 F.3d 274, 283 (4th Cir. 2005). Both of these cases, Wilmore argues, stand for the proposition that because Wilmore's testimony is absolutely immune, it cannot be used against him for any purpose and must be essentially erased from the record.

In *Briscoe*, the Supreme Court ruled that Section 1983 does not allow a convicted defendant to assert a claim against a police officer for giving perjured testimony at the defendant's trial. The Court held that the common law absolute immunity that has historically protected private witnesses from subsequent damages liability for their testimony also protects testifying police officers and other witnesses from Section 1983 liability. *Briscoe v. LaHue*, 460 U.S. 325, 345-46 (1983). Applying *Briscoe*, the Fourth Circuit ruled in this case that "it is an indisputable proposition" that Wilmore cannot be held liable for his testimony at Washington's criminal trial. *Washington v. Wilmore*, 407 F.3d 274, 283 (4th Cir. 2005). The court then stated that the proper inquiry was "whether Washington's conviction was a reasonably foreseeable result of Wilmore's initial act of fabrication" and noted the importance of determining whether Wilmore's false statement in the police report influenced the manner in which the prosecution was conducted. *Id.*

Courts considering the applicability of *Briscoe* in police misconduct cases have held that a witness cannot immunize pretrial conduct by testifying about it. *See, e.g., Snyder v. City of Alexandria*, 870 F. Supp. 672, 688 (E.D. Va. 1994) ("An officer who has violated an accused's rights, through conduct outside the courtroom, does not absolve himself of § 1983 liability by testifying about the charged conduct."). Wilmore now argues that, even where a Section 1983 claim is based on a pretrial event rather than on trial testimony, that testimony must be excluded as evidence of the event's occurrence. He cites an Eleventh Circuit case, *Rowe v. City of Fort*

14

*Lauderdale*, 279 F.3d 1271 (11th Cir. 2002), for the proposition that acts for which a prosecutor enjoys absolute immunity cannot be considered as evidence of the prosecutor's membership in a conspiracy for which the prosecutor did not have immunity. In *Rowe*, the Eleventh Circuit held that there would only be sufficient evidence for a jury to find the prosecutor, Lazarus, engaged in a conspiracy to deprive the plaintiff of his rights if the jury were allowed to consider his immunized prosecutorial actions. *Id.* at 1282. This would render the prosecutor's absolute immunity illusory because the conspiracy charge would simply become a proxy for liability based on the immune activities. Hence, the prosecutor's conduct at trial could not be used as evidence of his participation in a conspiracy for which he enjoyed no immunity. *Id.*

An important distinction between this case and *Rowe* lies in the availability of other evidence of misconduct aside from that immunized by *Briscoe*. In *Rowe*, the only evidence that would have allowed the jury to find the defendant liable for conspiracy was immunized and could not have been a basis for liability itself. Here, in contrast, a great deal of other evidence besides Wilmore's testimony supports the fabrication of evidence claim: to take only one example, Bennett's statements during his opening and rebuttal summation are as probative of causation, if not more so, than Wilmore's testimony. Hence, unlike the situation in *Rowe*, the use of immunized actions as evidence of pretrial misconduct is not simply an attempt to sidestep *Briscoe*'s protections.

Further, the Eleventh Circuit's ruling was limited by its language to conspiracy cases. Questions of conspiracy liability present different issues than those before the Court. In conspiracy cases, the risk that otherwise protected judicial activity will be chilled by a subsequent conspiracy charge is significant, *see id.*, and much greater than it is cases involving fabrication of

15

evidence such as this. Indeed, a number of courts have ruled that claims of conspiracy to commit an immunized act generally fail, because a person may not be prosecuted for conspiring to perform an act that he may perform with impunity. *See, e.g., Lewis v. Gupta,* 54 F. Supp. 2d 611, 619 n.12 (E.D. Va. 1999); *accord Reasonover v. St. Louis County, Missouri,* 447 F.3d 569, 580 (8th Cir. 2006).

In contrast, in fabrication of evidence cases, it is clear that the fabricator may be liable for his pretrial actions even where he himself has offered the evidence in an immunized judicial proceeding. *See, e.g., Zahrey v. Coffee,* 221 F.3d 342 (2d Cir. 2000). Although *Zahrey* dealt with whether the immunized activities broke the chain of causation, the Second Circuit also noted that the question had repercussions for the reach of absolute immunity. *See id.* at 354 n.10 ("Deeming the chain of causation broken by the prosecutor's use of the evidence he himself fabricated would also, in practical effect, enlarge the scope of the prosecutor's absolute immunity."). The Second Circuit noted that a prosecutor may be sued for a pretrial fabrication when his use of the fabricated evidence at trial results in the loss of the accused's liberty, despite the risk that this may expose prosecutors to more lawsuits by acquitted defendants. *Id.* at 354 n.11. In other words, the court here necessarily considered immunized conduct because it addressed the fabricator's use of fabricated evidence at trial and its role in causing harm.

At least one circuit has ruled explicitly that immunized testimony may be used as evidence of a claim based on a non-immunized action. In *Morley v. Walker,* 175 F.3d 756, 761 (9th Cir. 1999), the Ninth Circuit stated that evidence of a prosecutor's conduct, "even though he may have absolute immunity for it, may come in at trial if relevant to proving . . . conduct for which he has only qualified immunity." Further, in an unpublished decision, the Fourth Circuit

16

considered trial statements as evidence of a pretrial fabrication on a motion for summary judgment. *White v. Wright*, 150 Fed. Appx. 193, 199 (Sept. 23, 2005) ("White's strongest evidence of deliberate fabrication . . . is probably Lt. Wright's statements, in his report and during his testimony at trial."). Although *White* is not binding precedent, it suggests that trial testimony may serve as evidence of a distinct pretrial fabrication.

Here, as in *Zahrey* and *White*, Wilmore's liability is not based on his trial testimony but rather on the pretrial fabrication of evidence. Causation is an essential element of Washington's claim, and proving this point necessarily involves some examination of the degree to which the false statement at issue influenced Bennett's prosecution of the case, a question which can be answered circumstantially by examining what prosecution witnesses said at trial. This Court was cautious to emphasize, however, in both the jury instructions and in its statements to the jury during the course of the trial, that the jury could not base liability on Wilmore's testimony, but could only consider it to the degree that it reflected the impact of Wilmore's pretrial fabrication on the way the Commonwealth's Attorney prosecuted the case.

The admission of Wilmore's testimony for this limited purpose does not run counter to the rationales for immunity described in Briscoe. Where, as here, the source of liability is not the testimony itself but an earlier act of misconduct, the testimony is valuable as circumstantial evidence of knowledge or causation, rather than for the actual statements made by the witness. In this situation, there is far less pressure on a witness to perjure himself or censor his testimony. *See Briscoe*, 460 U.S. at 333.

Finally, despite Wilmore's argument to the contrary, Plaintiff never suggested that

17

Wilmore's testimony was perjurious. Curtis Reese Wilmore never testified that Washington had nonpublic information, nor did he repeat the statement made in the police report, and hence there was no arguably perjured testimony before the jury. Wilmore also argues that Washington used the trial testimony for a purpose not allowed by the Court's instructions: to argue that the Q&A itself was a fabrication. Although Washington's arguments could be interpreted to lead to that conclusion, the jury was properly instructed that it could not find that Wilmore had fabricated evidence unless it found that the statement in the police report was a fabrication.

Washington argues that Defendant waived any objection to the introduction of Curtis Reese Wilmore's trial testimony by failing to object to the Court's proposed jury instruction regarding immunity. Given Wilmore's numerous filings regarding absolute immunity, as well as his continuing objection at trial, this argument is unpersuasive. Wilmore objected on multiple occasions, and thus his silence with regard to the jury instruction certainly does not waive this issue, which has been properly preserved.

## Conclusion

Wilmore is not entitled neither to a new trial nor to judgment as a matter of law. Sufficient evidence supported the jury's verdict for Washington, and Wilmore has failed to show that allowing the verdict to stand will result in a miscarriage of justice. Accordingly, his motions for new trial and judgment as a matter of law shall be denied.

An appropriate order shall issue this day.

ENTERED: *[signature]*
U.S. District Judge
August 23, 2006

Case 3:02-cv-00106-NKM-BWC  Document 710  Filed 08/24/06  Page 18 of 18  Pageid#: 5489